BERIZZI BROTHERS COMPANY *v.* STEAMSHIP PESARO.

APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK.

No. 334.   Argued May 7, 1926.—Decided June 7, 1926.

A ship owned and possessed by a friendly foreign government, and operated by it in the carriage of merchandise for hire, in the interest and service of the nation, is a public ship and is immune from arrest under process based on a libel *in rem* by a private suitor; and the District Court has no jurisdiction of the case under Jud. Code, § 24, cl. 3, granting that court jurisdiction of " all civil causes of admirality and maritime jurisdiction." P. 570.

Affirmed.

APPEAL from a decree of the District Court in admiralty dismissing a libel *in rem* against a ship owned, possessed, and operated for trade purposes by the Italian Government, for want of jurisdiction. See 277 Fed. 473.

*Mr. Oscar R. Houston,* with whom *Messrs. D. Roger. Englar* and *Ezra G. Benedict Fox* were on the brief, for appellant.

The distinction between the operations of a government in its sovereign capacity while carrying on national objects, and its operations in its commercial capacity, for profit, has been recognized by the courts from the earliest times. *The Exchange,* 7 Cr. 116; *United States* v. *Wilder,* 3 Sumn. 308; *Briggs* v. *Light Boats,* 11 Allen 157; *The Siren,* 7 Wall. 152; *The Davis,* 10 Wall. 15; *Long* v. *The Tampico,* 16 Fed. 491; *In re Muir,* 254 U. S. 522; *The Pesaro,* 255 U. S. 216; *The Carlo Poma,* 255 U. S. 219; *Ex parte Hussein Lufti Bey,* 256 U. S. 616; *Ex parte City of New York, No. 1,* 256 U. S. 490; *Ex parte City of New York, No. 2,* 256 U. S. 503; *The Western Maid,* 257 U. S. 419; *The Sao Vicente,* 260 U. S. 151; *The Gul Djemal,* 264 U. S. 90; *Ex parte Transportes Maritimos,* 264 U. S. 105. This distinction, apparent in all the above admiralty cases, exists also in other branches of the law. *Bank of United States* v. *Planters Bank,* 9 Wheat. 904; *South Carolina* v. *United States,* 199 U. S. 437; *Los Angeles* v. *Los Angeles Gas Corp.,* 251 U. S. 32; *Horowitz* v. *United States,* 267 U. S. 458; *Rindge Co.* v. *Los Angeles,* 262 U. S. 700; *Bank of Kentucky* v. *Wistar,* 3 Pet. 431; *Penn.* v. *Bridge Co.,* 13 How. 518; *Curran* v. *Arkansas,* 15 How. 304; *Vilas* v. *City of Manila,* 220 U. S. 345. Furthermore, in admiralty actions this distinction between commercial and sovereign functions is all the easier to make and apply, and is in reality fundamental; for in this country, under our theory of actions *in rem,* the ownership of the vessel is in reality immaterial, it being a well established " principle of the maritime law that the ship, by whomsoever owned and navigated, is considered as herself the wrongdoer liable for the tort." *The John G. Stevens,* 170 U. S. 113.

That the immunity allowed property of a foreign government is to be determined by the immunity which this government demands for itself in regard to similar property, is shown by *The Santissima Trinidad,* 7 Wheat. 283; *Bank of Augusta* v. *Earle,* 13 Pet. 519; *Russian Soviet Republic* v. *Cibrario,* 235 N. Y. 255.

The policy of the United States, as shown in the Acts of Congress, has been to subject government owned merchant ships to the same laws, regulations, and liabilities as privately owned ships. *The Lake Monroe,* 250 U. S. 246; *Nahmeh* v. *United States,* 267 U. S. 122; *Shewan & Sons* v. *United States,* 266 U. S. 108; *The Attualita,* 238 Fed. 909; *Workman* v. *City of New York,* 179 U. S. 552; *United States* v. *Wilder,* 3 Sumn. 308. Under the Italian law no immunity is afforded to merchant ships. It would certainly seem an anomaly to grant to the Pesaro an immunity in our courts which she would not have in her own country and which a similar ship, owned and operated by the United States, would not enjoy either in the United States or in Italy.

A remedy *in rem* in admiralty against the property of a sovereign may quite properly be recognized even though a suit *in personam* would not lie against the same sovereign. *United States* v. *Wilder,* 3 Sumn. 308; *The Davis,* 10 Wall. 15; *The Santissima Trinidad,* 7 Wheat. 283; *The Appam,* 243 U. S. 124; *The Siren,* 7 Wall. 152; *United States* v. *The Thekla,* 266 U. S. 328; *Workman* v. *City of New York,* 179 U. S. 552.

It must be remembered that the conception of a maritime lien in England is quite different from the conception in this country. In England it is considered to be a *jus ad rem* while in America it is held to be a *jus in re.* See *The Young Mechanic,* 2 Curtis 404. The difference is fundamental and is well illustrated by the reasoning of the court of appeal in *The Parlement Belge* (1880) 5 Prob. 197, the leading case in England upon the general

question of sovereign immunity in admiralty. In fact, that case is the very foundation of all the later English decisions upon the subject. This difference has been noted and accepted by our courts. *Ramsdell Co.* v. *C. G. T.,* 182 U. S. 406; *The Eugene F. Moran,* 212 U. S. 466. In England, the vessel is not liable for torts committed while in charge of a compulsory pilot, *The Maria,* 1 W. Rob. 95, whereas in this country the vessel is held responsible. *The China,* 7 Wall. 53, and others. The English theory, is that a right *in rem* is only a power in the creditor to have the debtor's *res* sold in order to have the claim paid out of the proceeds. The ship is merely security for the owner's liability. On the other hand, in this country a right *in rem* is considered as a *jus in re,* rather than a *jus ad rem. The Young Mechanic,* 2 Curtis 404; *The John G. Stevens,* 170 U. S. 113. See also *Brig Malek Adhel,* 2 How. 210.

*Mr. Homer L. Loomis* for appellee.

The question is whether ch. 20 of the Act of September 24, 1789, 1 Stat. 76, as now found in the Judicial Code, § 24, cl. 3, conferring admiralty and maritime jurisdiction on the District Courts of the United States includes, in its grant of power, jurisdiction to proceed *in rem* against a vessel of the type of the Pesaro; whether the Pesaro, under that grant of jurisdiction, was subject to a maritime lien. *The Pesaro,* 255 U. S. 216; *The Carlo Poma,* 255 U. S. 219. This is materially different from the question whether the Pesaro, when in the port of New York, was subject to the local jurisdiction. *Tucker* v. *Alexandroff,* 183 U. S. 424.

At the time of the adoption of the Act of September 24, 1789, it was a principle of law accepted among all civilized nations that sovereignty was not subject to suit, and it was recognized and agreed by the founders that grants of jurisdictional power embodied in the Federal Constitution

should, in their construction, be limited accordingly. Vattel, Bk. I, § 4; Bk. IV, § 108; The Federalist, No. 81; 3 Elliott's Debates, 2d ed. 533, 555; *Hans* v. *Louisiana,* 134 U. S. 1; *Chisholm* v. *Georgia,* 2 Dall. 419; *Ex parte State of New York, No. 1,* 256 U. S. 490. The principle of the non-suability of a sovereign power was also then considered as extending to the sovereign's property. *Moitez* v. *The South Carolina,* 17 Fed. Cas. 574; *The Exchange,* 7 Cr. 116.

The grant of the admiralty and maritime jurisdiction in 1789 has ever since been narrowly construed and never extended by implication to cover a sovereign or his property. It has been construed as excluding jurisdiction over suits brought, in the absence of consent, against sovereigns *in personam. Blamberg Bros.* v. *United States,* 260 U. S. 452; *The Isonomia,* 285 Fed. 516; *Ex parte State of New York, No. 1,* 256 U. S. 490; *Ex parte Madrazzo,* 7 Pet. 627. It has been construed as excluding jurisdiction over suits brought, in the absence of consent, against the property of sovereigns, viz., (1) property of the United States, *The Othello,* 18 Fed. Cas. 901; *The Thomas A. Scott,* 90 Fed. 746; *The Western Maid,* 257 U. S. 419; (2) property of the States of the Union, *Ex parte State of New York, No. 2,* 256 U. S. 503; (3) property of municipal corporations, *The Fidelity,* 8 Fed. Cas. 1189; *The Seneca,* 21 Fed. Cas. 1080; *The Protector,* 20 Fed. 207; *The John McCraken,* 145 Fed. 705; (4) property of foreign sovereigns, *The Exchange,* 7 Cr. 116; *The Pizarro,* 19 Fed. Cas. 786; *The Pampa,* 245 Fed. 137; *The Maipo,* 252 Fed. 627; *The Maipo,* 259 Fed. 367; *The Carlo Poma,* 259 Fed. 369, reversed 255 U. S. 219; *The Imperator,* 1924 A. M. C. 596; *Nevada, ex Rogday,* 1926 A. M. C. 531.

The jurisdiction *in rem* granted by the Act, even as against the property of private persons, has been construed most strictly. *The Western Maid,* 257 U. S. 419;

*The Ira M. Hedges,* 218 U. S. 264; *The John McCraken,* 145 Fed. 705; *Osaka Shosen Kaisha* v. *Lumber Co.,* 260 U. S. 490; *The Yankee Blade,* 19 How. 82. And as against the property of sovereigns it will not be implied. *The John G. Stevens,* 170 U. S. 113; *The Western Maid,* 257 U. S. 419; *The Jupiter* (C. A.) (1924), P. 236; *United States* v. *Herron,* 20 Wall. 251.

The legislative history of the United States confirms the exclusion from the admiralty and maritime jurisdiction of any remedies *in rem* against the public property of a sovereign power. *United States* v. *Morgan,* 99 Fed. 570; *United States Shipping Co.* v. *United States,* 146 Fed. 914; *The Lake Monroe,* 250 U. S. 246, 258 Fed. 77; *The Florence H.,* 248 Fed. 1012; *Blamberg Bros.* v. *United States,* 260 U. S. 452; *Shewan & Sons* v. *United States,* 266 U. S. 108; *Nahmeh* v. *United States,* 267 U. S. 122; *The Isonomia,* 285 Fed. 516. It follows that the *Pesaro,* a public merchant ship of a foreign sovereign, is exempt from the process *in rem* of the District Court. *The Othello,* 18 Fed. Cas. 901; *Goodwin* v. *United States,* 17 Wall. 515; *The Attualita,* 238 Fed. 909; *Ex parte Muir,* 254 U. S. 522; *Klein* v. *New Orleans,* 99 U. S. 419; *The Tervaete* (C. A.) (1922), P. 259.

When a *res* is merely being employed to render public service in the possession of a private person, pursuant to some contract with the sovereign, no such difficulty exists. *Goodwin* v. *United States,* 17 Wall. 515; *New Orleans-Belize S. S. Co.* v. *United States,* 239 U. S. 202; *Ackerlind* v. *United States,* 240 U. S. 531; *Gromer* v. *Standard Dredging Co.,* 224 U. S. 362; *Morgan* v. *United States,* 14 Wall. 531. To hold mere public service not a proper test of immunity can obviously cause no hardship. On the other hand, to upset the determinative character, for purposes of rights *in rem,* of possession and ownership, is to desert old land-marks that have proved entirely safe and trustworthy guides in the past and follow a lead that, because

of the very vagueness and indefiniteness of the term "public service," apart from the substantial considerations above discussed, may take us into endless confusion. Distinguishing *The Siren,* 7 Wall. 152; *The Davis,* 10 Wall. 15; *Long* v. *The Tampico,* 16 Fed. 491; *United States* v. *Wilder,* 3 Sumn. 308; *The Johnson Lighterage Co., No. 24,* 231 Fed. 365.

The Pesaro was necessarily employed in the pursuit of public purposes or national objects; just as is any of the merchant vessels owned and operated as such by the United States. National objects embrace many ends other than those of war and peace. To promote the general welfare is universally regarded as a national object, and is specifically mentioned in the preamble of the Constitution as one of the six great national aims that the founders saw in drafting that instrument. Cf. Vattel, Bk. I, §§ 86–87. The national character of the objects that a public, government-owned, merchant marine is calculated to procure was recognized by Congress in enacting the law providing therefor, as those objects are set forth in the preamble of that Act. *Title Guarantee & Trust Co.* v. *Crane Co.,* 219 U. S. 24; *United States* v. *Ansonia Brass Co.,* 218 U. S. 452; *Tucker* v. *Alexandroff,* 183 U. S. 424. Those cases distinguishing between the public and private activities of municipalities are not here in point. A real sovereign, a state, a nation, is always sovereign. In none of its activities is it ever subject to a higher human will, individual or collective.

The government-owned merchant ships of the United States have been recognized to be public property engaged in public business and requiring to be immune from admiralty process *in rem.* *The Lake Monroe,* 250 U. S. 246; 258 Fed. 77; *Blamberg Bros.* v. *United States,* 260 U. S. 452; *Shewan & Sons* v. *United States,* 266 U. S. 108; *The Nahmeh,* 267 U. S. 122; *The Florence H.,* 248 Fed. 1012; *The Isonomia,* 285 Fed. 516. The govern-

ment-owned merchant ships of foreign powers have been held to be public ships and immune from the process *in rem* of our admiralty courts. *The Maipo,* 252 Fed. 627; 259 Fed. 367; *The Carlo Poma,* 259 Fed. 369, reversed 255 U. S. 219; *The Imperator,* 1924 A. M. C. 596; *The Pietro Gori* (D. C. E. D. N. Y., 1924) unreported. Government-owned merchant ships have been held to be public ships and not subject to admiralty process *in rem* in the other leading commercial nations of the world. 1. In England, *The Parlement Belge,* L. R. 5 P. D. 197; *Young* v. *The Scotia,* (1903), A. C. 501; *The Jassy* (1906), P. 270; *The Gagara* (C. A.) (1919), P. 95; *The Porto Alexandre* (C. A.) (1920), P. 30; *The Tervaete,* (C. A.) (1922), P. 259; *The Jupiter,* (C. A.) (1924), P. 236. The general American practice was that followed formerly in England. *The Marquis of Huntley,* 3 Hagg. Adm. 246, as interpreted and approved of in *The Parlement Belge,* 5 P. D. 197. 2. In Germany, *Von Hellfield* v. *Russian Gov.,* 5 Am. J. Int. L., 490; *Salling* v. *U. S. Shipping Board,* Hanseatische Gerichtszeitung (Hauptblatt) (1921), 85. 3. In France, *Lambiege & Pujol* v. *Spanish Gov.,* (1849) Dalloz I, 5; *The Englewood,* Clunet (1920), 621. The letter of the Italian lawyers attached to the stipulation of facts, when carefully read, will be seen not to establish a contrary practice for Italy.

Courts other than those of admiralty have construed their various jurisdictions as likewise excluding any power to issue process against the persons of sovereigns or to attach their property.

MR. JUSTICE VAN DEVANTER delivered the opinion of the Court.

This was a libel *in rem* against the steamship " Pesaro " on a claim for damages arising out of a failure to deliver certain artificial silk accepted by her at a port in Italy for

carriage to the port of New York. The usual process
issued, on which the vessel was arrested; and subsequently
she was released, a bond being given for her return, or the
payment of the libellant's claim, if the court had jurisdic-
tion and the claim was established. In the libel the ves-
sel was described as a general ship engaged in the common
carriage of merchandise for hire. The Italian Ambassa-
dor to the United States appeared and on behalf of the
Italian Government specially set forth that the vessel at
the time of her arrest was owned and possessed by that
government, was operated by it in its service and inter-
est; and therefore was immune from process of the courts
of the United States. At the hearing it was stipulated
that the vessel when arrested was owned, possessed and
controlled by the Italian Government, was not connected
with its naval or military forces, was employed in the
carriage of merchandise for hire between Italian ports and
ports in other countries, including the port of New York,
and was so employed in the service and interest of the
whole Italian nation as distinguished from any individual
member thereof, private or official; and that the Italian
Government never had consented that the vessel be seized
or proceeded against by judicial process. On the facts so
appearing the court sustained the plea of immunity and
on that ground entered a decree dismissing the libel for
want of jurisdiction. This direct appeal is from that
decree and was taken before the Act of February 13, 1925,
became effective.

The single question presented for decision by us is
whether a ship owned and possessed by a foreign gov-
ernment, and operated by it in the carriage of merchan-
dise for hire, is immune from arrest under process based
on a libel *in rem* by a private suitor in a federal district
court exercising admiralty jurisdiction.

This precise question never has been considered by this
Court before. Several efforts to present it have been made

in recent years, but always in circumstances which did not require its consideration.    The nearest approach to it in this Court's decisions is found in *The Exchange*, 7 Cranch 116, where the opinion was delivered by Chief Justice Marshall.    There a libel was brought by citizens of this country against an armed vessel in the possession of French naval officers, the libellants' claim being that they were the true owners, that the vessel had been wrongfully taken from them and then converted into an armed vessel, and that they were entitled to have it restored to them through a proceeding in admiralty.    Diplomatic correspondence resulted in the presentation by a law officer of this government of a formal suggestion in the suit to the effect that at the time of the arrest under the libel the vessel was claimed and possessed by the French Government as a war ship, was temporarily within our waters for a lawful purpose, and therefore was immune from the process whereon she was arrested.    In the opinion the Chief Justice attributed to every nation an exclusive and absolute jurisdiction within its own territory subject to no limitation not having its consent, observed that the consent might be either express or implied, and then said (p. 136):

  " The world being composed of distinct sovereignties, possessing equal rights and equal independence, whose mutual benefit is promoted by intercourse with each other, and by an interchange of those good offices which humanity dictates and its wants require, all sovereigns have consented to a relaxation, in practice, in cases under certain peculiar circumstances, of that absolute and complete jurisdiction within their respective territories which sovereignty confers.

  " This consent may, in some instances, be tested by common usage, and by common opinion, growing out of that usage.

  "A nation would justly be considered as violating its faith, although that faith might not be expressly plighted,

which should suddenly and without previous notice, exercise its territorial powers in a manner not consonant to the usages and received obligations of the civilized world.

" This full and absolute territorial jurisdiction being alike the attribute of every sovereign, and being incapable of conferring extra-territorial power, would not seem to contemplate foreign sovereigns nor their sovereign rights as its objects.  One sovereign being in no respect amenable to another; and being bound by obligations of the highest character not to degrade the dignity of his nation, by placing himself or its sovereign rights within the jurisdiction of another, can be supposed to enter a foreign territory only under an express license, or in the confidence that the immunities belonging to his independent sovereign station, though not expressly stipulated, are reserved by implication, and will be extended to him.

" This perfect equality and absolute independence of sovereigns, and this common interest impelling them to mutual intercourse, and an interchange of good offices with each other, have given rise to a class of cases in which every sovereign is understood to waive the exercise of a part of that complete exclusive territorial jurisdiction, which has been stated to be the attribute of every nation."

After discussing the status of a sovereign, his ministers and his troops when they or any of them enter the territory of another sovereign, he proceeded (p. 141):

" If there be no treaty applicable to the case, and the sovereign, from motives deemed adequate by himself, permits his ports to remain open to the public ships of foreign friendly powers, the conclusion seems irresistible, that they enter by his assent.  And if they enter by his assent, necessarily implied, no just reason is perceived by the court, for distinguishing their case from that of vessels which enter by express assent.

" In all the cases of exemption which have been reviewed, much has been implied, but the obligation of

what was implied has been found equal to the obligation of that which was expressed. Are there reasons for denying the application of this principle to ships of war?"

And then, after suggesting that there is a wide difference between the status of private individuals who enter foreign territory, or send their private ships there for purposes of trade, and the status of public war vessels when in foreign waters, he further said (p. 145):

" It seems, then, to the court, to be a principle of public law, that national ships of war, entering the port of a friendly power, open for their reception, are to be considered as exempted by the consent of that power from its jurisdiction.

" Without doubt, the sovereign of the place is capable of destroying this implication. He may claim and exercise jurisdiction, either by employing force, or by subjecting such vessels to the ordinary tribunals. But until such power be exerted in a manner not to be misunderstood, the sovereign cannot be considered as having imparted to the ordinary tribunals a jurisdiction, which it would be a breach of faith to exercise. Those general statutory provisions, therefore, which are descriptive of the ordinary jurisdiction of the judicial tribunals, which give an individual whose property has been wrested from him, a right to claim that property in the courts of the country in which it is found, ought not, in the opinion of this court, to be so construed, as to give them jurisdiction in a case, in which the sovereign power has impliedly consented to waive its jurisdiction."

It will be perceived that the opinion, although dealing comprehensively with the general subject, contains no reference to merchant ships owned and operated by a government. But the omission is not of special significance, for in 1812, when the decision was given, merchant ships were operated only by private owners and there was little thought of governments engaging in such operations. That came much later,

The decision in *The Exchange* therefore cannot be taken as excluding merchant ships held and used by a government from the principles there announced. On the contrary, if such ships come within those principles, they must be held to have the same immunity as war ships, in the absence of a treaty or statute of the United States evincing a different purpose. No such treaty or statute has been brought to our attention.

We think the principles are applicable alike to all ships held and used by a government for a public purpose, and that when, for the purpose of advancing the trade of its people or providing revenue for its treasury, a government acquires, mans and operates ships in the carrying trade, they are public ships in the same sense that war ships are. We know of no international usage which regards the maintenance and advancement of the economic welfare of a people in time of peace as any less a public purpose than the maintenance and training of a naval force.

The subsequent course of decision in other courts gives strong support to our conclusion.

In *Briggs* v. *Light Boats*, 11 Allen 157, there was involved a proceeding against three vessels to subject them to a lien and to satisfy it through their seizure and sale. The boats had been recently acquired by the United States and were destined for use as floating lights to aid navigation. Whether their ownership and intended use rendered them immune from such a proceeding and seizure was the principal question. In answering it in the affirmative the state court, speaking through Mr. Justice Gray, afterwards a member of this Court, said (p. 163): "These vessels were not held by the United States, as property might perhaps be held by a monarch, in a private or personal, rather than in a public or political character. . . . They were, in the precise and emphatic language of the plea to the jurisdiction, held

and owned by the United States for public uses." And again (p. 165): "The immunity from such interference arises, not because they are instruments of war, but because they are instruments of sovereignty; and does not depend on the extent or manner of their actual use at any particular moment, but on the purpose to which they are devoted."

In *The Parlement Belge,* L. R. 5 P. D. 197, the question was whether a vessel belonging to Belgium and used by that government in carrying the mail and in transporting passengers and freight for hire could be subjected to a libel *in rem* in the admiralty court of Great Britain. The Court of Appeal gave a negative answer and put its ruling on two grounds, one being that the vessel was public property of a foreign government in use for national purposes. After reviewing many cases bearing on the question, including *The Exchange,* the court said:

"The principle to be deduced from all these cases is that, as a consequence of the absolute independence of every sovereign authority, and of the international comity which induces every sovereign state to respect the independence and dignity of every other sovereign state, each and every one declines to exercise by means of its Courts any of its territorial jurisdiction over the person of any sovereign or ambassador of any other state, or over the public property of any state which is destined to public use, or over the property of any ambassador, though such sovereign, ambassador, or property be within its territory, and, therefore, but for the common agreement, subject to its jurisdiction."

Sometimes it is said of that decision that it was put on the ground that a libel *in rem* under the British admiralty practice is not a proceeding solely against property, but one directly or indirectly impleading the owner—in that instance the Belgian Government. But this latter was given as an additional and independent ground, as is expressly stated in the opinion at page 217.

The ruling in that case has been consistently followed and applied in England from 1880, when it was made, to the present day. *Young* v. *The Scotia,* 1903 A. C. 501; *The Jassy,* L. R. 1906 P. D. 270; *The Gagara,* L. R. 1919, P. D. 95; *The Porto Alexandre,* L. R. 1920, P. D. 30; *The Jupiter,* L. R. 1924, P. D. 236.

In the lower federal courts there has been some diversity of opinion on the question, but the prevailing view has been that merchant ships owned and operated by a foreign-government have the same immunity that warships have. Among the cases so holding is *The Maipo,* 252 Fed. 627, and 259 Fed. 367. The principal case announcing the other view is *The Pesaro,* 277 Fed. 473. That was a preliminary decision in the present case, but it is not the one now under review, which came later and was the other way.

We conclude that the general words of section 24, clause 3, of the Judicial Code investing the district courts with jurisdiction of " all civil causes of admiralty and maritime jurisdiction " must be construed, in keeping with the last paragraph before quoted from *The Exchange,* as not intended to include a libel *in rem* against a public ship, such as the " Pesaro," of a friendly foreign government. It results from this that the court below rightly dismissed the libel for want of jurisdiction.

*Decree affirmed.*