## THE NAVEMAR.
### No. 15102.

District Court, E. D. New York.

July 26, 1938.

Bigham, Englar, Jones & Houston, T. Catesby Jones, and James W. Ryan, all of New York City, for libelant.

Lynch & Hagen, Charles W. Hagen, Henry C. Eidenbach and John S. Bull, all of New York City (Jesse L. Rosenberg, of New York City, of counsel), for intervening petitioner.

GALSTON, District Judge.

Prior proceedings in this cause bearing on the application of the Spanish Ambassador to intervene and to have the decree of this court, which awarded possession of the Steamship Navemar to the libellant, vacated, are reported in The Navemar, D. C., 17 F.Supp. 647; Id., D.C., 18 F.Supp. 153; Id., 2 Cir., 90 F.2d 673, and in Id., 303 U.S. 68, 58 S.Ct. 432, 82 L.Ed. 667. The opinion of the Supreme Court concludes with the instruction that (page 436):

"The respondent will be permitted to intervene for the purpose of asserting the Spanish government's ownership and right of possession of the vessel, and the order of the District Court will be modified accordingly."

Pursuant to the permission granted by an order of this court, entered on the mandate of the Supreme Court, Fernando de los Rios filed a special claim and intervention.

It must be observed that much that is now urged by the intervenor was previously considered by this court. It was determined on the basis of the showing heretofore made that no one had taken possession of the Navemar in behalf of the Spanish Government. Mr. Justice Stone, writing for the Supreme Court, said:

"The District Court concluded, rightly we think, that the evidence at hand did not support the claim of the suggestion that the Navemar had been in the possession of the Spanish government. The decree of attachment, without more, did not operate to change the possession which, before the decree, was admittedly in petitioner. To accomplish that result, since the decree was in invitum, actual possession by some act of physical dominion or control in behalf of the Spanish government was needful, The Davis, 10 Wall. 15, 21, 19 L.Ed. 875; Long v. Tampico, D.C., 16 F. 491, 493, 494; The Attualita, supra [4 Cir., 238 F. 909]; The Carlo Poma, 2 Cir., 259 F. 369, 370, reversed on other grounds 255 U.S. 219, 41 S.Ct. 309, 65 L.Ed. 594, or at least some recognition on the part of the ship's officers that they were controlling the vessel and crew in behalf of their government. Both were lacking, as was support for any contention that the vessel was in fact employed in public service. See Long v. Tampico, supra, 16 F. 491, 493, 494; cf. Berizzi Bros. Co. v. S. S. Pesaro, supra [271 U.S. 562, 46 S.Ct. 611, 70 L.Ed. 1088]."

So it becomes important to determine to what extent the additional proof offered by the Spanish Ambassador meets the tests suggested.

For one thing it appears when the Navemar finished unloading at Edgewater, New Jersey, on December 2, 1936, and was shifted to Red Hook Anchorage, New York, by the Dalzell Towing Company, Martinez, her master, signed the towage slip as follows:

"Manuel Martinez, Agente Consulado de Espana."

But on the stand he testified that his orders for the transfer of the Navemar from Edgewater to Red Hook Flats were given to him by Garcia & Diaz, agents of the Navemar; just why he signed the towage receipt as agent for the Spanish Consul is not clear, for there was controversy at that time between the master and Consul concerning the latter's interference with the crew. The master testified:

"It is because the company of the Spanish Maritime Navigation, I had to place myself subject to their orders to be able to load, and as I could not do it because Mr. Consul had raised the crew—had spoken to the crew to go on strike, he told them to deny themselves to help in loading the boat so that then I went to the Sud Americana Company so that they could pay the receipt of that ticket—I could not pay anything, that you don't allow the ship to work on my account, by means of the Sud Americana Company, or for the account of the Sud Americana Company, because if the Consul wishes to make himself the owner of the ship, he is going to be afraid of the expense, and as I am not the owner, as he has said, because he told the crew not to work for me and unless the trouble is settled, as we had to bring the case to court, then I shall pay because then the boat will be mine when they deliver to me, and then you deny the fact that you wish to work."

The master's testimony conforms with the statement in his affidavit, made January 11, 1937, now in evidence, wherein he recites that it was under instructions from the owner of the Navemar, the libellant, that the ship was moved from Edgewater to the anchorage at Red Hook Flats, Brooklyn.

Again the intervenor urges that the receipt by Martinez of the sum of $300 from the Spanish Consul at New York must be interpreted as evidence of recognition of control by the Spanish Government. The paper reads:

"Received from the Spanish Consul General in New York the amount of $300., as advanced for the expense of the vessel under my command; New York, December 2, 1936, Master of the Steamship Navemar."

This money was paid by the Consul solely as a reimbursement to Martinez for moneys which he had advanced to members of the crew. The receipt is not new evidence. It is found in the Martinez affidavit in the record considered by both the Circuit Court of Appeals and the Supreme Court. In that affidavit Martinez explains that in a conference held with Careaga, Spanish Consul in New York, he informed Careaga that the latter's attempt to countermand orders for loading "given by the time charterer on authority from Garcia & Diaz, representing the real owner," was likely to cause him personally a consider-

able financial loss because he had "advanced members of the crew money to be repaid" when they collected their salaries, "as I had been in the habit of doing until their salaries were settled at the end of the voyage or on owners' instructions before a consul, and I had no money of my own as I had used all the money I had in making these advances; * * * that since Mr. Careaga was not obtaining authority of the owners to settle the crew's wages and was apparently not going to discharge them from their shipping contract with the owners, and as he had mentioned that he was going to take care in the future in some indefinite and unusual way of the salaries of the crew, I wanted to know if when the salaries were settled I could get back from the members of the crew the advances made by me from my personal funds; it was thereupon that Careaga agreed to make the settlement of $300."

The testimony with respect to the happenings on December 2, 1936, both in the office of the Consul General and on board the vessel, adds nothing of moment to that heretofore considered. The committee of the crew prevented the Robbins Dry Dock repair men, acting under the orders of the libellant, from carrying on their work, but there is no evidence that the committee either then or at any other time acted for or in behalf of the Spanish Government, as alleged in the petitioner's claim. Even the resolutions adopted by the committee on December 1st contain no suggestion that the committee was acting for or in behalf of the Republic of Spain. It appears that the crew gathered and agreed to name a committee "that in their representation would do or arrange the following matters: First, to reiterate their unconditional support to the Government of Madrid. Second, to clear up the legal status of its seamen. Third, try to arrange that the indebtedness of the Compania Espanola de Navegacion Maritima, S. A. or its effective agent of the said company, Messrs. Garcia & Diaz, have acquired with said crew. Fourth, to get in contact with the anti-fascist organizations for all those matters relating with that nation before."

The functions of a crew on a Spanish merchant vessel, as set forth in the regulations produced by the Spanish Consul General, certainly do not include taking over the command of the vessel or transferring title to the vessel. The best ex-

planation concerning the formation of this committee and its acts is found in the Martinez affidavit. Five members of the crew stated that they had been elected by the crew as a committee "to take charge of the provisions and the pay of the crew." Martinez protested that under Spanish law they were not authorized to exercise authority over provisions and pay.

It is significant that though the Consul was called as a witness by the intervenor he did not testify that he or anyone else representing the Republic of Spain gave any instructions in respect to the formation of the committee or that the committee had been designated as a representative of the Republic of Spain, to act for or in its behalf. The most that is inferable is that the Consul supported the committee in its controversy with the master, and that the Consul was probably responsible for the committee's interference with the repairs that the libellant was seeking to have performed.

There is to be considered also the troublesome letter written by the master on December 7, 1936 to the charterer of the Navemar. This letter presents difficulties because apparently it is an admission that possession of the vessel was taken by the Spanish Government on October 28, 1936. A careful reading of the letter, however, shows that the master is informing the charterer that such possession and confiscation were "by decree of October 10th, published in the official Gazetta, October 11th, *according to orders which I received in Buenos Aires on October 16th, 1936, from the Director General of the Merchant Marine at Madrid.*" Italics mine. The letter likewise says that,

"Since October 28th I have been generally under orders of the Spanish Government as given me by the Spanish Consul at Buenos Aires. * * *

"Since October 28th I have been operating under orders of the Spanish Consul at Buenos Aires. * * * Since arriving at New York I have presented myself to the Spanish Consul here and he has given me orders that the steamship 'Navemar' is still to be held at the disposal of the Spanish Government."

The orders referred to in the last paragraph are set forth in the letter of the Consul at New York under date of November 28, 1936, wherein the Consul writes

that in accordance with instructions from the Ambassador, "the ship of your command is from this date at the disposition of the government of the Republic and you must await new instructions from him in anything concerning future activities and give me, at the earliest possible moment a detailed statement of the expenses of said ship such as salaries, victuals, etc., as well as a relation of the repairs of small importance that you are at the present time having effected."

The context of Martinez' letter becomes more understandable in the light of the master's actions in the performance of his duties from the time that the vessel departed from Spain on July 26, 1936. The vessel arrived at Buenos Aires on October 9, 1936. While there he received a cablegram from the Director of Navigation, informing him of the confiscation of the Navemar. Following the receipt of the cablegram, the master visited the Spanish Consul at Buenos Aires. He received no instructions from the Spanish Consul General there stationed—certainly none concerning his status as master of the ship; nor did the Spanish Consul General at Buenos Aires take possession of the Navemar or inform him that he wished to take possession thereof. The Navemar then proceeded to Rosario, another port in Argentine, where the boat was loaded with six thousand tons of linseed consigned to the Linea Sud Americana, Inc. There the ship's roll was deposited with the Spanish Consul in the ordinary course of business, by him as master for her owner, the libellant, Compania Espanola de Navegacion Maritima, S. A., pursuant to the customary practice of masters of Spanish private merchant vessels. In the ordinary course the roll was to have been returned to the master before the vessel sailed from Rosario, but as the Consul's office was closed for the day, the master was instructed by the shippers of the linseed cargo at Rosario that because of tide conditions the Navemar should sail at once and the shippers agreed to make arrangements to have the rest of the linseed cargo delivered at Buenos Aires; and the representative of the consignees, Linea Sud Americana, Inc. (who were also the charterers) informed the master that he would call at the Consul's office at Rosario the following day to obtain the ship's roll and would forward it by mail to him at Buenos Aires. At Buenos Aires, pursuant to the request of the Spanish Consul General, the master presented the ship's register. The register, when returned to the master, bore the endorsement:

"By cable, dated the 15th of October, 1936, the Spanish Embassy at this capital, His Excellency, the Minister of the Secretary of State, informs that this vessel passes to the property of the Spanish Government by decree of confiscation, published in the Gazetta on the date of the 11th of the present month."

The ship's roll, when returned, bore a similar endorsement. But when these documents were thus returned to the master, he was given neither orders nor instructions with regard to the management or operation of the ship. There is no evidence of a taking of possession either at Buenos Aires or at Rosario by anyone authorized to act on behalf of the Republic of Spain. There were no instructions given by the Spanish Consul or the Spanish Embassy, or by anyone authorized to act for the Republic of Spain in respect to the possession of the Navemar or its command. Accordingly we find no interference on the part of the Spanish Government with the ordinary and usual voyage from Argentine. As he had been theretofore, the master was carrying on, in possession of the ship, on behalf of the owners and charterers. A cargo for private interests was loaded on the vessel at both ports in Argentine; fuel was provided as theretofore by the libellant or the charterer; the vessel was manned by the same officers and crew as before; no new shipping articles were entered into;—thus the vessel sailed from Argentine under the same control as when she had arrived on October 9th at the port of Buenos Aires.

The only basis for the language employed by the master in his letter of December 7, 1936 is found in the cablegram from the Marine Director, and the notations made by the consular agents on the ship's roll and the ship's register at Rosario and Buenos Aires respectively. So far as the record discloses the only orders or instructions given by the Spanish Consul at Buenos Aires were that the master should cable the General Director of the Merchant Marine at Madrid that he was authorized to sail for New York.

The letter is not new evidence. It was an exhibit in the District Court, and though not reproduced as part of the rec-

ord before the Circuit Court of Appeals or the Supreme Court, counsel state that it was argued before both courts and printed by the respondent (the petitioner in the present phase of the proceeding) in its brief submitted to the Supreme Court.

If in terms it is inconsistent with a denial that the vessel was in the possession of the Republic of Spain, weight must nevertheless be given to the testimony of the master for he repeatedly stated that neither the Spanish Consul at Rosario nor at Buenos Aires took possession of the Navemar, nor did either of them inform him that he wished to take possession of the vessel or had instructions so to do.

Moreover, the master's acts on arrival in the port of New York, his discharge of the cargo under direction of the ship's agent, collection of the freight money paid by the consignees to the agents of the time charterer in New York, his controversy with consul and crew, are inconsistent with the statements of the letter if interpreted literally. As is set forth in the opinion reported The Navemar, D.C., 18 F.Supp. 153, shortly after the Navemar arrived at New York, on November 25, 1936, he reported the arrival to the agents of the libellant and asked for instructions. Pursuant to those instructions he discharged the cargo in accordance with the charter party and the bills of lading. Thereafter he took the ship's roll to the Spanish Acting Consul General in New York, deposited it, as was his custom, and called attention to the endorsement that had been made on the ship's roll in Rosario. Likewise he showed the Consul the cables and radiograms that had passed, but the Consul General in New York was without information and had no instructions to give.

Before discharging the cargo he asked Careaga for a definite order and Careaga told him to proceed unloading slowly so that he might get some news from Madrid. It is important to note that Martinez refused to abide by that instruction, informing the Consul that the unloading would have to be completed speedily to comply with the contract of the vessel with the consignees of the cargo. So that though the vessel arrived in the port of New York on November 25, 1936 there was no assertion of ownership and certainly none of possession made by the Spanish Consul in New York until November 28, 1936, when he wrote to Martinez that he had received instructions from the Ambassador in the United States that the Navemar from that date was "at the disposal of the Government of the Republic and you must await new instructions from him in anything concerning future activities and give me, at the earliest possible moment a detailed statement of the expenses of said ship such as salaries, victuals, etc., as well as a relation of the repairs of small importance that you are at the present time having effected."

There was nothing in the master's attitude or acts to indicate that at any time he had been acting as a representative of the Spanish Government, or that he held possession of the ship for or in its behalf. He pointed out to Careaga that the vessel was under charter and that its owner would have to be consulted for authority, and that he had had no advice from the owner to the effect that the boat belonged to the Spanish Government.

The new evidence introduced by the intervenor does not change the findings heretofore reported in The Navemar, D.C., 18 F.Supp. 153. It is true that Garcia, the second engineer of the Navemar, testified that the master, before leaving Buenos Aires, called the committee of members of the crew of the Navemar and read to them the cablegram which he had received from the Director General of Navigation. This witness testified that the master then said that he was a legitimate representative of the Government and whoever did not obey his orders would be reported and sent back to Spain and would be punished by the Government. Martinez, however, denied that he had read that cablegram to the officers, and he denied that he had notified the crew that they were in the service of the Republic of Spain.

From the foregoing I must conclude that the additional evidence fails to support the contention that prior to the arrival in the territorial waters of the United States the Navemar had been in the possession of the Spanish Government, nor do I find proof of recognition by the ship's officers that they were controlling the vessel and crew in behalf of their government.

Significant also is the failure of the intervenor to offer the testimony, either by deposition or otherwise, of the consuls at Buenos Aires or Rosario, or of its accredited representative here or in Argen-

tine, of instructions from the Minister of Marine in Madrid.

And there is an entire absence of proof that the vessel was employed in the public service.

In the footnote of the opinion of Mr. Justice Stone, found on page 76, 58 S.Ct. on page 435, reference is made to some English cases. The Jupiter, 1924, P. 236, 241, 244 (cf. The Jupiter No. 2, 1925, P. 69; The Jupiter No. 3, 1927, P. 122, 125) and to The Cristina, 59 Lloyd's List Law Reports 43, 50. It is there indicated that the possession taken in behalf of the claimant government was actual and that in the case of The Cristina the master and crew were in the pay of the Spanish Government. In the report of The Cristina in Lloyd's List, Vol. 60, P. 147, at p. 160, Lord Wright found:

"The master and mate have sworn that at all material times they and the crew have had continuous possession of the ship on behalf of the Spanish Government and have held themselves and the ship at that Government's disposal, subject to arrest by the Court which was effected by a warrant issued on the appellants' application supported by affidavits. It is also sworn that the ship's expenses have been disbursed by the Spanish Government since the new captain took charge."

And though Lord Maugham agreed that, "On July 14th the respondents, by their agents, and, it should be mentioned, without a breach of the peace, took possession of the vessel. For the reasons given by your lordships I accept the view that since July 14th the respondents by their agent, have been in de facto possession of the ship * * *" he significantly observed, "But it seems to me that the claim by the Spanish government for immunity from any form of process in this country may extend to cases where possession of ships or other chattels had been seized in this country without any shadow of right, and also to cases where maritime liens were sought to be enforced by actions in rem against vessels belonging to a foreign Government and employed in the ordinary operations of commerce. For my part I think such a claim ought to be scrutinized with the greatest care. In these days and in the present state of the world, diplomatic representations made to a good many States afford a very uncertain remedy to the unfortunate persons who may have been injured by the foreign Government."

Since the Spanish Government never had possession of the Navemar either before the vessel reached the territorial waters of the United States or thereafter, I conclude that it cannot successfully assert the doctrine of immunity as defined in The Exchange v. M'Faddon, 7 Cranch 116, 3 L.Ed. 287; Berizzi Bros. Co. v. The Pesaro, 271 U.S. 562, 46 S.Ct. 611, 70 L.Ed. 1088; Ex parte Muir, 254 U.S. 522, 41 S. Ct. 185, 65 L.Ed. 383.

It remains to observe that not only is the edict or decree of October 10, 1936, by itself insufficient to effect a change in possession, but in the absence of evidence of possession, the right to possession could not be successfully asserted in our courts, for in effect it is a penal statute. The decree of October 10, 1936, contains the passage:

"For the same reasons which caused incautacion by the State of several vessels * * * I hereby decree as follows."

Answers to the interrogatories propounded by the libellant, which are now in evidence, explain what these reasons were. The vessels referred to in the interrogatories are the Duero and the Turia and the reasons for the attachment of those vessels were:

"The vast preparation of the Military Fascist uprising, aimed against the liberties of the Spanish people, which are symbolized in the Republican Regime and in the legitimate government of the popular front, which as the price of peace was established in our country by the National will, serenely and overwhelmingly expressed through the democratic means of universal suffrage, has been able to attract the aid of capitalists and corporations who, giving preference to the gain of their business with utter disregard of the blood of the Spaniards, did not hestitate undermining our public treasury by every imaginable means, placing at the service of the traitors monies and wealth which they always kept from the honest, social contribution.

"Among these corporations are the steamship companies who, far from lending their collaboration to the Republic, as is their duty, in the transportation services, so heavily burdened due to the Civil War, are helping the prolongation of this

war by aiding in the criminal work of the Fascists with a cleverly disguised and stubbornly maintained attitude.

"The Government cannot permit, under the protection of laws and established international usages which protect the free commerce and traffic of private individuals, that the integrity of the nation be attacked."

The meaning of the Spanish word "incautacion" is given by Dr. Larcegui, libellant's expert. He quotes from the judgment of Mr. Justice Porter in Soc. Belge des Betons v. London & Lancashire Ins. Co., 60 Lloyd's List Law Reports 225, decided March 14, 1938, at pages 232 to 234:

"The Spanish word used is 'incauta cion'. It was originally used legislatively of the expropriation of the property of the late King of Spain, without compensation, and has since been commonly used. It means the taking of possession by a competent tribunal or authority; it is final, has some suggestion of punishment and none of return. When a temporary taking is intended, the word 'occupacion' is employed."

So in effect, as thus interpreted, the decree of October 10, 1936 must be deemed one of confiscation and therefore penal in character. The courts of this country will not enforce such statutes of a foreign sovereign. The Antelope, 10 Wheat. 66, 6 L.Ed. 268; Wisconsin v. Pelican Insurance Co., 127 U.S. 265, 8 S.Ct. 1370, 32 L. Ed. 239.

Indeed, from the brief of the intervenor, it appears that the Republic of Spain is not seeking the enforcement of any law or decree but relies on the contention that the vessel arrived in the waters of the United States under the Spanish flag and in the possession of citizens of the Republic of Spain. The argument is that the Republic of Spain had itself enforced the decree of October 10, 1936 before the Navemar arrived in the territorial waters of the United States. It. is because I believe the evidence does not support that contention that I conclude that the petition and intervention should be dismissed.

If this opinion is not in sufficient compliance with the rule requiring findings of fact and conclusions of law, submit findings of fact and conclusions of law in accordance therewith.