**CHINA NATIONAL CHEMICAL IMPORT & EXPORT CORP.**

and

**Peoples Insurance Company of China, Plaintiffs,**

v.

**M/V LAGO HUALAIHUE**

and

**Empresa Maritima del Estado (Chilean Government Merchant Marine), Defendants.**

Civ. No. T–80–1369.

United States District Court, D. Maryland.

Jan. 6, 1981.

William R. Dorsey, III, and Semmes, Bowen & Semmes, Baltimore, Md., and Gordon W. Paulsen and Haight, Gardner, Poor & Havens, New York City, for plaintiffs.

Richard R. Jackson, Jr., Donald C. Greenman and Ober, Grimes & Shriver, Baltimore, Md., for defendants.

THOMSEN, Senior District Judge.

Defendants' motion to dismiss this case for lack of jurisdiction over the subject matter and over the defendants turns upon the proper construction of the Foreign Sovereign Immunities Act of 1976 (hereinafter FSIA), 28 U.S.C. § 1602 et seq., particularly § 1605(b), dealing with maritime claims against foreign states.

I.

Section 1605(b) provides:

1605. General exceptions to the jurisdictional immunity of a foreign state.

\* \* \* \* \* \*

(b) A foreign state shall not be immune from the jurisdiction of the courts of the United States in any case in which a suit in admiralty is brought to enforce a maritime lien against a vessel or cargo of the foreign state, which maritime lien is based upon a commercial activity of the foreign state: *Provided,* That—

(1) notice of the suit is given by delivery of a copy of the summons and of the complaint to the person, or his agent, having possession of the vessel or cargo against which the maritime lien is asserted; but such notice shall not be deemed to have been delivered, nor may it thereafter be delivered, if the vessel or cargo is arrested pursuant to process obtained on behalf of the party bringing the suit—unless the party was unaware that the vessel or cargo of a foreign state was involved, in which event the service of process of arrest shall be deemed to constitute valid delivery of such notice; and

(2) notice to the foreign state of the commencement of suit as provided in section 1608 of this title is initiated within ten days either of the delivery of notice as provided in subsection (b)(1) of this section or, in the case of a party who was unaware that the vessel or cargo of a foreign state was involved, of the date such party determined the existence of the foreign state's interest.

Whenever notice is delivered under subsection (b)(1) of this section, the maritime lien shall thereafter be deemed to be an in personam claim against the foreign state which at that time owns the vessel or cargo involved: *Provided,* That a court may not award judgment against the foreign state in an amount greater than the value of the vessel or cargo upon which the maritime lien arose, such value to be determined as of the time notice is served under subsection (b)(1) of this section.

Added Pub.L. 94–538, § 4(a), Oct. 21, 1976, 90 Stat. 2892.

Section 1603(d), dealing with the definition of certain terms used in the FSIA, states:

A "commercial activity" means either a regular course of commercial conduct or a particular commercial transaction or act. The commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose.

## II.

Plaintiffs are the owner and insurer of a cargo of chemical fertilizer which, on March 10, 1980, was being carried from the United States to China on the M/V Sapporo Olympics. Defendants are the M/V Lago Hualaihue, a general cargo vessel owned and operated by the other defendant, Empresa Maritima del Estado (Empresa), the Chilean Government Merchant Marine. On March 10, 1980, the defendant vessel, while carrying a commercial cargo of bulk nitrates from Chile to Pensacola, Florida, collided with the M/V Sapporo Olympics in international waters off Panama. Plaintiffs allege that the collision was caused in whole or in part by negligence chargeable to defendants, and by unseaworthiness of the M/V Lago Hualaihue, without any contributory negligence on the part of plaintiffs, and that the collision resulted in some $1,500,000 damage to the chemical fertilizer on the M/V Sapporo Olympics.

After her cargo was discharged in Florida, the M/V Lago Hualaihue came to Baltimore, putting in at Maryland Shipbuilding & Drydock Company for repairs necessitated by the collision and by an allision with a helicopter platform near Galveston, Texas.

Seeking to enforce their alleged maritime lien against the M/V Lago Hualaihue for the cargo damage, plaintiffs brought this action under the FSIA on May 29, 1980. As required by 28 U.S.C. § 1605(b)(1) and (2), appropriate notice of the suit was timely given to the captain of the vessel, who had possession of her, and timely notice, in Spanish as well as in English, was sent to the Presidente of Empresa and to the Chilean Ministro de Relaciones Exteriores, both in Santiago, Chile.

Venue is proper under 28 U.S.C. § 1391(f), as amended by the FSIA.

## III.

In support of its motion to dismiss for lack of jurisdiction, Empresa argues that the maritime lien asserted by the plaintiff is not "based upon a commercial activity of the foreign state," within the meaning of that term as used in 28 U.S.C. § 1605(b). Plaintiffs respond that the legislative history of the FSIA shows that the clear intent of Congress in enacting § 1605(b) was to give the federal courts jurisdiction over such maritime claims as plaintiffs assert in this case and to specify the procedure to be followed in such cases. Both sides have filed full and careful briefs and their respective advocates have ably and fairly argued the questions at issue. Many decisions of the Supreme Court, of the Fourth Circuit and other appellate courts, and of this and other district courts, as well as the legislative history of the FSIA, have been cited and discussed. No decision precisely in point has been cited or found.

## IV.

The history of the doctrine of foreign sovereign immunity following the decision of Chief Justice Marshall in *Schooner Exchange v. McFadden*, 11 U.S. (7 Cranch) 116, 3 L.Ed. 287 (1812), through *Berizzi Bros. Co. v. S.S. Pesaro*, 271 U.S. 562, 46 S.Ct. 611, 70 L.Ed. 1088 (1926), *Mexico v. Hoffman*, 324 U.S. 30, 65 S.Ct. 530, 89 L.Ed. 729 (1945), and the practice following the "Tate Letter" of May 19, 1952, 26 Dept. State Bull. 984 (1952), 1960 AMC 898, is set out in the opinion of Mr. Justice White in *Alfred Dunhill of London, Inc. v. Cuba*, 425 U.S. 682, at 695–715, 96 S.Ct. 1854, at 1861, 48 L.Ed.2d 301 (1976), and need not be repeated here. That history is also set out in the legislative history of the FSIA, [1976] U.S.Code Cong. & Ad.News, pp. 6604 et seq.

See also *Flota Maritima Browning de Cuba v. Motor Vessel Ciudad de la Habana*, 335 F.2d 619 (4 Cir. 1964).

After the 1952 Tate letter and until the 1976 FSIA, the State Department generally recommended and the federal courts generally found that foreign governments were not entitled to sovereign immunity in cases arising out of their commercial activities, although the deference to executive determination sometimes led to results that were inconsistent with the "restrictive foreign immunity theory." See *Jet Line Services, Inc. v. M/V Marsa el Hariga*, 462 F.Supp. 1165, 1169 (D.Md., Young, J., 1978). Between 1951 and 1976 governments increasingly engaged in commercial activities, including the ownership and operation of cargo vessels, and it was generally felt that an Act of Congress was needed to clarify the situation. The FSIA, 28 U.S.C. § 1602 et seq., was the result. The Statement accompanying the House Bill as amended (which was adopted) stated the four objectives of the proposed statute as follows:

First, the bill would codify the so-called "restrictive" principle of sovereign immunity, as presently recognized in international law. Under this principle, the immunity of a foreign state is "restricted" to suits involving a foreign state's public acts (jure imperii) and does not extend to suits based on its commercial or private acts (jure gestionis). This principle was adopted by the Department of State in 1952 and has been followed by the courts and by the executive branch ever since. Moreover, it is regularly applied against the United States in suits against the U.S. Government in foreign courts.

Second, the bill would insure that this restrictive principle of immunity is applied in litigation before U.S. courts. At present, this is not always the case. Today, when a foreign state wishes to assert immunity, it will often request the Department of State to make a formal suggestion of immunity to the court. Although the State Department espouses the restrictive principle of immunity, the foreign state may attempt to bring diplomatic influences to bear upon the State Department's determination. A principal purpose of this bill is to transfer the determination of sovereign immunity from the executive branch to the judicial branch, thereby reducing the foreign policy implications of immunity determinations and assuring litigants that these often crucial decisions are made on purely legal grounds and under procedures that insure due process. The Department of State would be freed from pressures from foreign governments to recognize their immunity from suit and from any adverse consequences resulting from an unwillingness of the Department to support that immunity. As was brought out in the hearings on the bill, U.S. immunity practice would conform to the practice in virtually every other country—where sovereign immunity decisions are made exclusively by the courts and not by a foreign affairs agency.

Third, this bill would for the first time in U.S. law, provide a statutory procedure for making service upon, and obtaining in personam jurisdiction over, a foreign state. This would render unnecessary the practice of seizing and attaching the property of a foreign government for the purpose of obtaining jurisdiction.

Fourth, the bill would remedy, in part, the present predicament of a plaintiff who has obtained a judgment against a foreign state. Under existing law, a foreign state in our courts enjoys absolute immunity from execution, even in ordinary commercial litigation where commercial assets are available for the satisfaction of a judgment. H.R. 11315 seeks to restrict this broad immunity from execution. It would conform the execution immunity rules more closely to the jurisdiction immunity rules. It would provide the judgment creditor some remedy if, after a reasonable period, a foreign state or its enterprise failed to satisfy a final judgment.

[1976] U.S.Code Cong. & Ad.News, pp. 6605–6.

The section-by-section analysis of the House Bill, as amended, which was adopted,

included the following explanation of the term "commercial activity," as used in the FSIA, including §§ 1603(d), 1605(a) and 1605(b).

(d) *Commercial activity.*—Paragraph (c) [sic., really (d)] of section 1603 defines the term "commercial activity" as including a broad spectrum of endeavor, from an individual commercial transaction or act to a regular course of commercial conduct. A "regular course of commercial conduct" includes the carrying on of a commercial enterprise such as a mineral extraction company, an airline or a state trading corporation. Certainly, if an activity is customarily carried on for profit, its commercial nature could readily be assumed. At the other end of the spectrum, a single contract, if of the same character as a contract which might be made by a private person, could constitute a "particular transaction or act."

As the definition indicates, the fact that goods or services to be procured through a contract are to be used for a public purpose is irrelevant; it is the essentially commercial nature of an activity or transaction that is critical. * * *

\* \* \* \* \* \*

The courts would have a great deal of latitude in determining what is a "commercial activity" for purposes of this bill. It has seemed unwise to attempt an excessively precise definition of this term, even if that were practicable. * * * [1976] U.S.Code Cong. & Ad.News, pp. 6614–15.

It is not disputed that the M/V Lago Hualaihue was at all material times owned and operated by an "agency or instrumentality of a foreign state," as defined in 28 U.S.C. § 1605(b); that said agency or instrumentality (the defendant Empresa) was engaged in the carriage of goods by sea, "a regular course of commercial conduct," as that term is used in § 1603(d), quoted above, and that Empresa's vessel, the M/V Lago Hualaihue was engaged at the time of the collision in carrying a commercial cargo (bulk nitrates) from Chile for delivery in the United States. If the M/V Lago Hua-

laihue had not been owned by an agency of the Chilean government, it could have been seized by the Marshal of this court under Supplemental Rule F, F.R.Civ.P., and such a case could have resulted in the sale of the vessel. The principal purpose of § 1605(b), quoted at the beginning of this opinion, was and is to provide a forum where the rights and liabilities of the respective parties can be litigated in an admiralty proceeding in which a foreign government is protected from the sale of its vessel to satisfy an adverse judgment. This is made clear by the following passage from the Legislative History, at p. 6620:

(b) *Maritime liens.*—Section 1605(b) denies immunity to a foreign state in cases where (i) a suit in admiralty is brought to enforce a maritime lien against a vessel or cargo of that foreign state, (ii) the maritime lien is based upon a commercial activity of the foreign state, and (iii) the conditions in paragraphs (1) and (2) of section 1605(b) have been complied with.

The purpose of this subsection is the [sic, really to] permit a plaintiff to bring suit in a U.S. district court arising out of a maritime lien involving a vessel or cargo of a foreign sovereign without arresting the vessel, by instituting an in personam action against the foreign state in a manner analogous to bringing such a suit against the United States. Cf. 46 U.S.C. 741, *et seq.* In view of section 1609 of the bill, section 1605(b) is designed to avoid arrests of vessels or cargo of a foreign state to commence a suit. Instead, as provided in paragraph (1), a copy of the summons and complaint must be delivered to the master or other person having possession of the vessel or cargo (such as the second in command of the ship).

If, however, the vessel or its cargo is arrested or attached, the plaintiff will lose his in personam remedy and the foreign state will be entitled to immunity—except in the case where the plaintiff was unaware that the vessel or cargo of a foreign state was involved. * * *

The provisions controlling execution on a judgment which may be obtained by plaintiffs herein are set out in the FSIA, §§ 1609–1611.

It is true, as noted by defendants, that 28 U.S.C. § 1330, titled "Actions against foreign states," provides:

(a) The district court shall have original jurisdiction without regard to amount in controversy of any nonjury civil action against a foreign state as defined in section 1603(a) of this title as to any claim for relief in personam with respect to which the foreign state is not entitled to immunity either under sections 1605–1607 of this title or under any applicable international agreement.

(b) Personal jurisdiction over a foreign state shall exist as to every claim for relief over which the district courts have jurisdiction under subsection (a) where service has been made under section 1608 of this title.

(c) For purposes of subsection (b), an appearance by a foreign state does not confer personal jurisdiction with respect to any claim for relief not arising out of any transaction or occurrence enumerated in sections 1605–1607 of this title.

It is also true, as noted by defendants, that Congress is and has been concerned with the rights of persons who "deal with" a foreign government. But the concern of Congress has not been as narrow as defendants' argument suggests. The provisions of the FSIA, particularly §§ 1605(b) and 1603(d), and the legislative history of the Act, show a broader interest. The jurisdiction of the district courts has been modified by the provisions of § 1605(b), quoted above, which broadened that jurisdiction in certain respects and reduced it in others. Section 1604 provides:

Subject to existing international agreements to which the United States is a party at the time of enactment of this Act a foreign state shall be immune from the jurisdiction of the courts of the United States and of the States except as provided in sections 1605 to 1607 of this chapter.

The crux of the dispute between the parties is the proper interpretation of the following clause in § 1605(b): "which maritime lien is based upon a commercial activity of the foreign state." Defendants argue that Congress did not intend to include all maritime torts within the coverage of § 1605(b), but only to include those tort claims where there is a commercial relationship between the plaintiff and the foreign state; and, therefore, that Congress used the words "based upon" rather than "arose out of" or "in connection with" so that only maritime liens which would be covered would be liens for supplies, repairs, necessaries, damage to cargo carried on the foreign state's ship, breach of charter, crew wages, towage, wharfage, liens on cargo for freight and like liens that are commercial in nature. Plaintiffs reply that Congress did not intend to limit § 1605(b) to cases where there is a commercial relationship between the injured party and the foreign state; rather, that Congress intended to allow plaintiffs, alleging such claims as are alleged in the complaint herein, to bring an action under § 1605(b) where the alleged maritime tort lien arises out of a commercial activity of a foreign state; e. g., the operation of a commercial cargo vessel as distinguished from the operation of a naval vessel.

 This court concludes that plaintiffs' interpretation of the statute is correct. The legislative history of the FSIA indicates that § 1605(b) was designed to provide a substitute for the usual *in rem* proceeding and to include collision claims, such as the claim in this case, among those claims which may be asserted against a foreign state if the provisions specified in that subsection are complied with.[1] If the courts were to

---

1. This court agrees with the following statement of the International Law and Transactions Division of the District of Columbia Bar at the Senate hearings:

Section 1605(b) of the Bill introduces a new method of enforcing maritime claims against foreign states. It replaces the normal *in rem* suit in admiralty, which is initiated by "ar-

adopt defendants' interpretation of the statute, many litigants who could have maintained an action in the courts of this country during the period when the Tate Letter was the controlling factor would now find themselves without a remedy in our courts.

Defendants argue that the words "based upon," as used in § 1605(b), provide a narrower remedy than would have been available to plaintiffs if the words "arising out of" had been used. Such a distinction cannot properly bar the prosecution of this case by plaintiffs, in view of the entire legislative history.

Defendants also argue that "[n]owhere in the legislative history of the Act is there any reference to jurisdiction in this country for non-commercial torts or maritime liens based upon torts that a foreign state is alleged to have committed abroad." It is true that there is no specific reference to such a case as the one at bar. On the other hand, there is no language in the Act or in the legislative history which would exclude torts covered by § 1605(b) which a foreign state is alleged to have committed abroad. We are concerned in this case with a suit in admiralty, governed by § 1605(b), and not with a different kind of civil action not governed by that subsection.

This court is satisfied that the allegations of the complaint herein meet the requirements of § 1605(b), and that defendants' motion to dismiss should be denied.[2]

It is so ordered.

rest" of the vessel, with an *in personam* action initiated by service of notice to the "person, or his agent, having possession" of the vessel and notice to the foreign state in accordance with Section 1608.

\* \* \* \* \* \*

Section 1605(b) is not intended to deprive litigants of any substantive rights, but instead to provide a new method of enforcing maritime liens without seizure of vessels of foreign states. \* \* \*

*Jurisdiction of U. S. Courts In Suits Against Foreign States: Hearings on HR 11315 Before the Subcommittee on Administrative and Governmental Relations of the House Judiciary Committee*, 94th Cong., 2nd Sess., 69 (1976).

2. It is, therefore, not necessary for this court to decide whether it would also have jurisdiction under 28 U.S.C. 1605(a)(2), which provides:

(a) A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case—

\* \* \* \* \* \*

(2) in which the action is based upon a commercial activity carried on in the United States by the foreign state; or upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States;