127 So.2d 687 (1961)
HARRIS and COMPANY ADVERTISING, INC., a Florida corporation, Appellant,
v.
REPUBLIC OF CUBA, Appellee.
No. 60-412.
District Court of Appeal of Florida. Third District.
March 2, 1961.
Rehearing Denied March 24, 1961.
*688 Guilmartin & Schneiderman, Miami, for appellant.
Bergstresser & Taylor, Miami, for appellee.
BARNS, PAUL D., Associate Judge.
The appellant-plaintiff, Harris and Company Advertising, Inc., brought an action in assumpsit against the appellee-defendant, Republic of Cuba, and procured the issuance and execution of various writs of attachment against chattels of the defendant and attachments by garnishment of debts owing the defendant by various garnishable defendants. The action was in personam but the remedy sought was in rem; hence a quasi-in-rem action.
Thereafter, a pseudo motion to dismiss was filed on July 15, 1960; and motions to strike said motion to dismiss were filed July 26, 1960. On July 26, 1960, plaintiff's attorneys gave notice of a hearing of all pending motions, said hearing to be on July 27th. At said hearing, the judge sustained the motion to dismiss and overruled the motions to strike the motion to dismiss, and orders were entered accordingly.
After the conclusion of the foregoing hearing, an ex parte motion to dissolve excessive attachments was presented to the judge by one not a party to the action, and an order was made, on July 27, 1960, dissolving all attachments and garnishments other than the attachment by garnishment of some $98,000 in United States currency held by the Florida National Bank & Trust Company.
Thereafter, on August 3, 1960, the plaintiff entered its appeal from (1) the order dismissing the action; (2) the order dissolving writs of attachment and garnishment as excessive; and (3) the order denying plaintiff's motions to strike the motion to dismiss. Of course, the latter order was not an appealable order, but it was assigned as error in the appeal from the judgment of dismissal. The other two orders were also assigned as error.
Before proceeding to treat the questions of jurisdiction and immunity of the Republic of Cuba, we will address ourselves to the pseudo motion to dismiss. The motion is as follows:
"Motion to Dismiss by Virtue of Special Appearance Solely to Contest Jurisdiction
"Comes now Bergstresser & Taylor, by and through Abelardo A. Leon Blanco, Consul General of the Republic of Cuba, a foreign nation, and alleges:
"(1) That the above styled cause is not within the jurisdiction of this Court without the consent of the Defendant;
"(2) That the above styled Court has no jurisdiction of or over the defendant, a foreign nation;
"(3) That any jurisdiction of the defendant by and before this Court be and the same is hereby expressly denied, refuted, *689 and in addition thereto, the defendant specifically alleges the immunity of a foreign nation from being made a defendant in an action of this kind, specifically asserting said immunity herein.
"Further that all writs of attachment or garnishment specifically levied against the defendant Republic of Cuba or its priviledged assets by virtue of the above, be and the same be forthwith dissolved.
 "Bergstresser & Taylor
 "By /s/ Richard G. Taylor"
It will be noted that said motion does not purport to be made on behalf of the Republic of Cuba. Neither does the body of the motion move for anything on behalf of anyone. Doubtless, the lower court judge treated the title as a part of the motion. It is not clear who appears on behalf of whom; the law firm for the consul or the consul for the law firm. In either case, the Republic of Cuba is not sufficiently represented to present questions of immunity for reasons hereinafter stated, and the lower court erred in not striking the motion.
The consul of a foreign country is not entitled under general international law, as well as under Consular Convention between Cuba and the United States of 1926, 44 U.S.Statutes 2471, and the Pan-American Consular Convention of 1932, 47 U.S. Statutes 1976, to represent the government of Cuba; such authority being exclusively within the privilege of diplomatic agents received as such by the United States. The local consul was unable to authorize the law firm to do something that he lacked authority to do. The claim of sovereign immunity is usually reserved to diplomatic representatives of the country involved, combined with suggestions to be obtained through the Department of State addressed to the court.
It is well known that the traditional rule of international law denied one sovereign the right to sit in court over another sovereign. As well stated in National City Bank of New York v. Republic of China, 348 U.S. 356, 75 S.Ct. 423, 426, 99 L.Ed. 389:
"The freedom of a foreign sovereign from being haled into court as a defendant has impressive title-deeds. Very early in our history this immunity was recognized [cases cited], and it has since become part of the fabric of our law."
However, the opinion further states that different trends entered recently "immediately touching the evolution of legal doctrines regarding a foreign sovereign's immunity," namely "the restrictive policy that our State Department has taken toward the claim of such immunity. As the responsible agency for the conduct of foreign affairs, the State Department is the normal means of suggesting to the courts that a sovereign be granted immunity from a particular suit. Ex parte Republic of Peru, 318 U.S. 578, 581, 63 S.Ct. 793, 795, 87 L.Ed. 1014, 1016. Its failure or refusal to suggest such immunity has been accorded significant weight by this Court. [cases cited] * * * Recently the State Department has pronounced broadly against recognizing sovereign immunity for the commercial operations of a foreign government, [Tate letter] 26 Dept. State Bull. 984 (1952), * * *" National City Bank of New York v. Republic of China, supra. Thus, the original rule of complete immunity from judicial jurisdiction to be exercised over a foreign government has been modified, first by the distinction between foreign sovereigns acting in their sovereign capacity (jure imperii) from acts of a business type (jure gestionis); the first form still entitling a foreign sovereign to immunity while the latter would put him on an equal footing with other private persons engaged in the same type of pursuits.
In an editorial comment in 47 American Journal of International Law, pp. 93-106 (1953) by William W. Bishop, Jr., entitled *690 "New United States Policy Limiting Sovereign Immunity," it is stated:
"A new United States position with respect to the immunity from jurisdiction of the local courts enjoyed by foreign governments engaged in commerce was demonstrated in the letter of May 19, 1952, from the Acting Legal Adviser of the Department of State to the Acting Attorney General. In this letter Acting Legal Adviser Jack B. Tate wrote:
"`The Department of State has for some time had under consideration the question whether the practice of the Government in granting immunity from suit to foreign governments made parties defendant in the courts of the United States without their consent should not be changed. The Department has not reached the conclusion that such immunity should no longer be granted in certain types of cases * * *.
"`A study of the law of sovereign immunity reveals the existence of two conflicting concepts of sovereign immunity, each widely held and firmly established. According to the classical or absolute theory of sovereign immunity, a sovereign cannot, without his consent, be made a respondent in the courts of another sovereign. According to the newer or restrictive theory of sovereign immunity, the immunity of the sovereign is recognized with regard to sovereign or public acts (jure imperii) of a state, but not with respect to private acts (jure gestionis) * * *.
"`* * * The reasons which obviously motivate state trading countries in adhering to the theory with perhaps increasing rigidity are most persuasive that the United States should change its policy. Furthermore, the granting of sovereign immunity to foreign governments in the courts of the United States is most inconsistent with the action of the Government of the United States in subjecting itself to suit in these same courts in both contract and tort and with its long established policy of not claiming immunity in foreign jurisdictions for its merchant vessels. Finally, the Department feels that the widespread and increasing practice on the part of governments of engaging in commercial activities makes necessary a practice which will enable persons doing business with them to have their rights determined in the courts. For these reasons it will hereafter be the Department's policy to follow the restrictive theory of sovereign immunity in the consideration of requests of foreign governments for a grant of sovereign immunity.'
"Through this action the Department is taking a position in accord with the practice of many countries. In Mr. Tate's letter, it was stated that the `classical' theory of virtually absolute sovereign immunity had generally been followed in the courts of the United States, the British Commonwealth of Nations, Czechoslovakia, Estonia, and probably Poland. It was said that the decisions of courts in Brazil, Chile, China, Hungary, Japan, Luxembourg, Norway, and Portugal might also be deemed to support this theory, if one or two old decisions in each country, prior to the development and adoption of the more limited theory, would form a sufficient basis for such determination. He reported that the newer or restrictive theory of sovereign immunity had originated in Belgium and Italy, had then been adopted by the courts of Egypt and Switzerland, and had more recently been embraced by the courts of France, Austria, and Greece. Apparently it is also being followed by Rumania and Peru, by the lower courts in The Netherlands, and possibly by Denmark. These conclusions of the Department of State as to the prevalence of restricted immunity in foreign courts appear to be amply *691 supported. Indeed, it may be noted that, although on the basis of repeated decisions of lower courts Mr. Tate follows the usual opinion in classifying the British Commonwealth as giving absolute immunity, nevertheless in The Cristina, [1938] A.C. 485, three of the five judges sitting in the House of Lords stated their belief that the law of England was not settled in favor of granting immunity to foreign merchant vessels merely because they were owned and operated by foreign governments. These views are particularly significant since the House of Lords has never actually decided in favor of immunity for commercial operations of foreign governments, and it would seem quite possible that in an appropriate case the highest British court would decide in favor of restricted rather than absolute immunity.
"With so many states denying the existence of immunity when the foreign government engages in commerce, one could hardly maintain that customary international law today requires that immunity be granted. As the Permanent Court of International Justice observed in the case of the S.S. Lotus, P.C.I.J., Series A, No. 10, p. 29:
"`as municipal jurisprudence is thus divided, it is hardly possible to see in it an indication of the existence of the restrictive rule of international law * * *.'
"There seems no doubt that the adoption by the United States of its new policy restricting sovereign immunity is fully in accord with the obligations of international law. There appears to be little, if any, generally accepted international law today with respect to the immunity of foreign governments when they go beyond traditional governmental activities. No international arbitral or judicial decision on the point can be found.
"The only treaties in the field appear to be ones which provide that immunities need not be granted when the government operates merchant vessels or engages in commercial undertakings. Indeed, in the Brussels Convention of April 10, 1926 (to which the United States is not a party), it was agreed that merchant vessels owned or operated by foreign governments, and the cargoes on board, should be subject to the same rules of liability, the same obligations, and the same procedures as would be applicable in the case of privately owned merchant vessels. Mr. Tate's letter points out that among the nations frequently classified as following the absolute theory of sovereign immunity, Brazil, Chile, Estonia, Germany, Hungary, Netherlands, Norway, Poland, Portugal, and Sweden are parties to the Brussels Convention and thus have relinquished an important of the immunity which they might claim under the classical theory. Besides the Brussels Convention, it may be recalled that the treaties of peace ending World War I provided that if the exenemy `Government engages in international trade, it shall not in respect thereof have or be deemed to have any rights, privileges or immunities of sovereignty.' Furthermore, various bilateral treaties expressly adopt the rule of restricted immunity; for example, the Treaty of Friendship, Commerce and Navigation between the United States and Italy, signed February 2, 1948, provides:
"`No enterprise of either High Contracting Party which is publicly owned or controlled shall, if it engages in commercial, manufacturing, processing, shipping or other business activities within the territories of the other High Contracting Party, claim or enjoy, either for itself or for its property, immunity therein from taxation, from suit, from execution of judgment, or from any other liability to which a privately *692 owned or controlled enterprise is subject therein.'
"Most of the contemporary writers who discuss the subject advocate cutting down the immunity of states in accordance with the restrictive theory, or maintain that this is already the law. Twenty years ago the Harvard Research in International Law, in its Draft Convention on Competence of Courts in Regard to Foreign States, declared in favor of the restricted immunity, although in his Comment as Reporter, Professor Jessup then said that `the exception to immunity here specified is highly controversial.' With the increase in nationalization of enterprises and state trading during the last two decades, and with the adoption in state after state of the rule denying immunity to foreign governments with respect to their business activities, the once controversial denial of immunity is rapidly becoming accepted."
In this country, the Department of State, in the well-known Tate letter, made clear its position that it will not intervene in favor of sovereign immunity in cases where non-governmental functions are involved. This letter was approved in National City Bank of New York v. Republic of China, supra, which makes any claim for sovereign immunity in our courts dependent on showing by evidence that the case involves matters jure imperii and not jure gestionis.
In this case, it appears that the defendant, through its agency, established to promote the business of tourism (Instituto Nacional de la Industria Turistica), hired the plaintiff's advertising agency to do promotional work in this country. From the uncontroverted allegations in the complaint it appears that the defendant has, through the "Instituto Nacional," hired plaintiff to perform services on its behalf, namely, promote the industry of tourism in this country. This shows clearly that such activity is not governmental in character. First of all, it is evident that the functions of promoting tourism in Cuba have been, at least within this country, simply subcontracted to a local private corporation, which could not have been a governmental function; furthermore, governmental functions as contrasted with commercial activities, could not have exercised within this country without an express consent of the Government of the United States. Just because it was purely commercial in nature, it was possible to have it performed in this country.
Thus it appears that the activity on the part of the defendant government is clearly non-governmental in nature and, consequently, cannot be invoked as a ground for sovereign immunity.
A final problem would remain, namely that of the nature of assets attached under the writ in the court below. In this regard, no special allegation has been made by the defendant that the property attached would be immune and, thus, could not have been used to establish quasi-in-rem jurisdiction and, in case plaintiff should be successful, for the satisfaction of its demand. Since the case of The Schooner Exchange v. M'Faddon, 1812, 7 Cranch 116, 11 U.S. 116, 3 L.Ed. 287, it is well settled that only governmental instrumentalities, like warships, are exempt from the jurisdiction of our courts. In holding that the suit should be dismissed, the Court stated:
"One sovereign being in no respect amenable to another; and being bound by obligations of the highest character not to degrade the dignity of his nation, by placing himself or its sovereign rights within the jurisdiction of another, can be supposed to enter a foreign territory only under an express license, or in the confidence that the immunities belonging to his independent sovereign station, though not expressly stipulated, are reserved by implication, and will be extended to him." 7 Cranch at page 137, 11 U.S. at page 137.
*693 In the present case, deposits in various banks have been attached, which, until it is shown by preponderance of the evidence that they are directly related to activities jure imperii, cannot be deemed immune from the powers of the courts within the territories of which they are kept by the decision of the foreign government itself. It would not be compatible with the principle of judicial powers of a sovereign nation if funds deposited as private funds in a private bank in this country, particularly if derived, used, or intended to be used in business type of activities here, would be clothed in a veil radiating foreign sovereignty.
Appellant contends that proceedings in attachment and garnishment are proper for debts actually due by debtor residing beyond the limits of the state, with which the appellee takes no issue. Such proceedings are authorized for the attachment of goods and chattels, lands and tenements of the debtor whenever the debtor "(4) resides beyond the limits of the State," § 76.04(4), Fla. Stat., F.S.A.; and for the attachment by garnishment for any goods, money, chattels or effects of the defendant in the hands, possession or control of a third person. §§ 77.01, 77.06, 77.18, Fla. Stat., F.S.A.
Appellee argues that the only question involved is the want of personal jurisdiction of the defendant, the Republic of Cuba. Although the action sounds in personam, the remedy sought is by attachment of personal property and attachment of debts owing the defendant by garnishment. Personal jurisdiction is required before a personal judgment may be entered against a defendant not a citizen of this state, but a judgment in rem may be entered in the absence of personal jurisdiction in actions on a debt due and owing, and personal judgments may be entered against garnishee over whom the court has acquired jurisdiction; provided always that the statutory requirements are first met and complied with. Personal jurisdiction of the defendant is not a condition precedent in order to maintain a quasi-in-rem action and prosecute it to final judgment.
In the leading case of Pennoyer v. Neff, 1878, 95 U.S. 714, 723-724, 24 L.Ed. 565, it is stated:
"So the State, through its tribunals, may subject property situated within its limits owned by non-residents to the payment of the demands of its own citizens against them; and the exercise of this jurisdiction in no way infringes upon the sovereignty of the State where the owners are domiciled. Every State owes protection to its own citizens; and when non-residents deal with them, it is a legitimate and just exercise of authority to hold and appropriate any property owned by such non-residents to satisfy the claims of its citizens. It is in virtue of the State's jurisdiction over the property of the non-resident situated within its limits that its tribunals can inquire into that non-resident's obligations to its own citizens, and the inquiry can then be carried only to the extent necessary to control the disposition of the property. If the non-resident have no property in the State, there is nothing upon which the tribunals can adjudicate."
In Cooper v. Reynolds, 1870, 10 Wall. 308, 77 U.S. 308, 19 L.Ed. 931, which is quoted with approval in Pennoyer v. Neff, supra, 95 U.S. at pages 924 and 932, the Supreme Court held as follows:
"But the plaintiff is met at the commencement of his proceedings by the fact that the defendant is not within that territorial jurisdiction, and cannot be served with any process by which he can be brought personally within the power of the court. For this difficulty the statute has provided a remedy. It says that, upon affidavit being made of that fact, a writ of attachment may be issued, and levied on any of the defendant's property, and a publication *694 may be made warning him to appear, and that thereafter the court may proceed in the case, whether he appears or not.
* * * * * *
"If the defendant appears, the cause becomes mainly a suit in personam, with the added incident, that the property attached remains liable, under the control of the court, to answer to any demand which may be established against the defendant by the final judgment of the court. But, if there is no appearance of the defendant, and no service of process on him, the case becomes, in its essential nature, a proceeding in rem, the only effect of which is to subject the property attached to the payment of the demand which the court may find to be due to the plaintiff."
The Restatement of Judgments, § 34 (1942) is equally clear as to the propriety of obtaining jurisdiction by attachment:
"Comment a:
"By statute in the various States provision is made for the attachment of property of the defendant not only where the defendant is personally subject to the jurisdiction of the court but also where he is not subject to the jurisdiction of the court. In the latter case if the defendant does not subject himself to the jurisdiction of the court by an appearance, the court has jurisdiction to apply the property so attached to the payment of the plaintiff's claim, although it has no jurisdiction to render a personal judgment against the defendant.
* * * * * *
"Comment b:
"If the defendant is the owner of land or of a chattel within the state, the land or chattel can be subjected to the jurisdiction of the court by attachment."
Appellee's contention is that Chapter 48, Fla. Stat., F.S.A., providing for constructive service of process, has no application when the defendant is a foreign nation. Section 48.01(1) specifically makes said chapter applicable against the parties "mentioned in § 48.02" (ib) in any action "(7) in which there shall have been issued and executed any writ of replevin, garnishment or attachment"; and § 48.02, supra, authorizes process by publication "upon any party, natural or corporate," including "any corporation or other legal entity." The Republic of Cuba is an entity because it exists and it is a legal entity because it exists in contemplation of law and it is a "party" to the action. To hold otherwise would require us to hold that a nation is not a legal entity. A foreign nation is within the scope of the class of parties who may be served with process by publication, but, of course, any judgment rendered adverse to such nation may not be in personam unless the court acquires personal jurisdiction of the defendant.
Upon the motion of Miami Marine Agency, Inc., at an ex parte hearing, the lower court entered the order dissolving all attachments and garnishments other than the garnishment against the Florida National Bank and Trust Company. It does not appear that the "Marine Agency" was named a party defendant to the suit or became a party defendant as a garnishee, or otherwise. Its motion merely states that it is the servicing agent for the steamship "Fundador" and that the movant is "affected by the attachments and garnishments in the above styled causes." Appellant assigns the entry of this order as error.
Appellant made the point that the entry of this order of dissolution was error because appellant was not given notice of the hearing and had no opportunity to be heard; that by such procedure, properties of the defendant were released irrespective of whether they were used in respect to the defendant's public or governmental activities (jure imperii) or in private or commercial activities (jure gestionis), and *695 likewise without regard as to which category the funds retained would fall, or whether the funds were subject to any rights of third parties having priority over the plaintiff. The assignment is well taken. Brooker v. Smith, Fla.App. 1958, 101 So.2d 607.
The orders and judgments appealed from or assigned as error are reversed and the cause is remanded for further proceedings not inconsistent herewith.
Reversed and remanded.
HORTON, C.J., and PEARSON, J., concur.