335 F.2d 619
 FLOTA MARITIMA BROWNING DE CUBA, SOCIADAD ANONIMA, Libelant, Appellee,
v.
MOTOR VESSEL CIUDAD DE LA HABANA, her Motors, Tackle, etc.,
Appellant.
BANCO CUBANO DEL COMERCIO EXTERIOR, succeeded by Banco Para
El Comercio Exterior, De Cuba, Respondent, Banco Para El
Comercio Exterior De Cuba, successor to Banco Cubano Del
Comercio Exterior, Cross-Libelant, Appellee,
v.
SOCIADAD ANONIMA, Cross-Respondent, Flota Maritima Browning
De Cuba, Appellant.
 No. 9127.
 United States Court of Appeals Fourth Circuit.
 Argued Nov. 5, 1963.
Decided July 14, 1964.
 
 Leonard B. Boudin, Washington, D.C. (Robert H. Williams, Jr., and Niles, Barton, Gans & Markell, Baltimore, Md., on brief), for appellant Motor Vessel Ciudad De La Habana, etc.
 William A. Grimes, Baltimore, Md. (Ober, Williams, Grimes & Stinson, Baltimore, Md., on brief), for appellee Flota Maritima Browning De Cuba, etc.
 Before HAYNSWORTH, BOREMAN and BRYAN, Circuit Judges.
 HAYNSWORTH, Circuit Judge:
 
 
 1
 Sovereign immunity, asserted on behalf of the Republic of Cuba, was held by the District Court to be unavailing. It found that Cuba's immunity, if any, had been waived when it filed answers to the libels without suggesting its immunity. We agree.
 
 
 2
 Banco Cubano Del Comercio Exterior and its successor, Banco Para El Comercio Exterior, De Cuba, were Cuban corporations organized by the Republic of Cuba for advancement of her foreign trade. Banco entered into a contract for the construction of certain vessels in England and Japan, and into another contract for the purchase of eight Canadian vessels, then lying in Halifax Harbor. It engaged the services of an American citizen, Browning, for the operation of Banco's vessels, and, for that purpose, Browning organized a Cuban corporation, Flota Maritima Browning De Cuba, Sociadad Anonima. Banco and Flota Maritima then entered into an agreement, which, in effect, was a bareboat charter of the Canadian vessels and an option to Flota Maritima to purchase them. It required that the vessels be transferred to Cuban registry and be manned by Cubans.
 
 
 3
 Under that agreement, Flota Maritima took possession of the eight Canadian vessels and moved one of them, the M/V Ciudad De La Habana, to Baltimore, where, on September 8, 1958, she entered a shipyard to be refitted for commercial operations.
 
 
 4
 Shortly before the work on the Habana was completed, the Cuban seamen were withdrawn from the eight vessels, Flota Maritima then took the position that, by the withdrawal of the Cuban seamen and other acts, Banco had broken the lease-purchase agreement. On October 30, 1958, it cabled Banco that it was terminating the lease-purchase contract, because of Banco's asserted breach, and that it would no longer keep possession of the eight vessels or be responsible for them. Flota Maritima previously had retained Hinkin's Steamship Agency to represent the Habana, and, on November 13, 1958, Banco engaged Hinkin's to act for it.
 
 
 5
 On June 9, 1959, Banco sold the eight Canadian ships to the Republic of Cuba and notified Hinkin's that 'all future instructions would come from' an agency of that Government.
 
 
 6
 On June 22, 1959, Flota Maritima filed a libel against the Habana in rem and against Banco in personam with a clause for foreign attachment of the ship. The libel sought damages for Banco's alleged breach of the lease-purchase contract with respect to all eight of the vessels. An amended libel was filed on October 9, 1959. Thereafter, three intervening libels were filed by others seeking compensation for services rendered to the Habana in Baltimore.
 
 
 7
 Banco filed exceptions and exceptive allegations to the original libel and to the amended one, raising questions of Admiralty's jurisdiction and the propriety of its exercise in the light of some of the stipulations of the agreement. These exceptions were overruled in February 1960.[1] Thereafter, Banco answered the libel, and, at the same time, the Republic of Cuba, itself, entered the case claiming ownership of the Habana, seeking leave to defend, and filing an answer to the libel. It also filed exceptions to one of the intervening libels.
 
 
 8
 In none of these several motions and pleadings filed on behalf of Banco and the Republic of Cuba, itself, was there any suggestion of sovereign immunity. There was no such suggestion in the case until May 11, 1962, when the Czechoslovakian Ambassador, on behalf of Cuba,[2] filed a plea and motion asserting exemption of the vessel from seizure under the doctrine of sovereign immunity.
 
 
 9
 In the meanwhile, Flota Maritima had proceeded against the other seven Canadian vessels in the Nova Scotia Admiralty Court. There, the question of sovereign immunity was promptly tendered and denied. On appeal to the Exchequer Court of Canada, the denial of sovereign immunity was reversed[3] and the judgment of the Exchequer Court was affirmed by the Supreme Court of Canada.[4]
 
 
 10
 In refusing to recognize the claim of sovereign immunity, the District Court expressed the opinion that the Canadian judgment was not res judicata nor the basis of a collateral estoppel, because, in the Court's opinion, there were certain differences in the factual questions and in the governing legal principles, but it clearly denied the plea on the basis of waiver. We find it necessary to consider only the waiver question, for, even if the Canadian judgment was res judicata if the question of sovereign immunity had been promptly and properly tendered, it has no bearing upon the question of whether the immunity had been waived and was no longer open for assertion in these proceedings.
 
 
 11
 The doctrine of sovereign immunity is of ancient vintage. It was established in this country as an absolute protection of an armed vessel in the services of a friendly sovereign in 1812.[5] Chief Justice Marshall reasoned from the premise that a visiting king of a friendly power and his ministers were entitled to personal immunity, a doctrine which was recognized throughout the western world. There was also the immunity of troops of a foreign power granted free passage through a friendly nation. The Court reasoned that our ports were open to naval vessels of a friendly power, and that the implied invitation carried with it an implied promise of immunity. Arrest of a naval vessel in the service of a friendly foreign sovereign would constitute the same kind of affront to his dignity as would arrest of his person, or that of his ministers, while on a friendly visit.
 
 
 12
 The doctrine has been extended to commercial vessels and other kinds of property owned by a friendly foreign power.[6]
 
 
 13
 The doctrine, which restricts otherwise clearly declared jurisdiction of the courts, or limits its exercise, is founded in recognition of its aid in the maintenance of friendly relations with friendly powers. Since the conduct of foreign affairs is a function of the Executive, it not unnaturally evolved that immunity in a particular case was extended to particular property without judicial inquiry, if suggested to the court by the Executive. The practice has been for the State Department, in an appropriate case, to suggest to the court, through the Attorney General of the United States, or a United States Attorney, that the particular property was immune from seizure. In such a case property is released without judicial inquiry into the facts or reasoning underlying the Executive suggestion.[7] This is necessarily so, because the Executive decision to recognize sovereign immunity in a particular case may depend upon intimate knowledge of matters affecting foreign affairs which are not public information and which are not fit subjects of judicial inquiry. Thus, this Court, unquestioningly, dismissed a Cuban ship and her cargo upon the Executive suggestion of sovereign immunity, even though the cargo claimant had introduced into the record evidence of waiver of sovereign immunity with respect to the determination and collection of that claim.[8]
 
 
 14
 Here, there has been no suggestion of immunity. It was sought of the State Department, but has not been forthcoming. That does not settle the matter, for, in the absence of such a suggestion, applicability of the doctrine is an appropriate subject of judicial inquiry.[9] When Executive suggestions of sovereign immunity are regularly sought and, in appropriate cases, readily granted, however, the absence of such a suggestion does indicate that the court is not venturing into a sensitive area in which its possible decrees might gravely embarrass the Executive's conduct of the Nation's foreign affairs. Though judicial inquiry, in such circumstances, may lead to a determination that the case is within the limits of the rule, its underlying reason is not commandingly present.[10]
 
 
 15
 Any sovereign immune from suit may consent to be sued and waive the immunity. When it does so, it subjects itself to the jurisdiction of the court and its exercise just as a private individual. Thus, in People of Porto Rico v. Ramos, 232 U.S. 627, 34 S.Ct. 461, 58 L.Ed. 763, Porto Rico was held to have waived her immunity when she affirmatively sought to be made a party defendant in order to assert her claim to the disputed property by escheat. Similarly, the Supreme Court held in Richardson, as Treasurer of Porto Rico v. Fajardo Sugar Company, 241 U.S. 44, 36 S.Ct. 476, 60 L.Ed. 879, that Porto Rico waived her immunity when she answered the complaints filed against her Treasurer, agreed upon a trial date, and permitted eight months to elapse. There are similar holdings of subordinate courts.[11]
 
 
 16
 Consent to suit is manifested and waiver of sovereign immunity accomplished when the sovereign enters a general appearance, certainly if the general appearance is unaccompanied by a claim of immunity. This has been repeatedly stated.[12] It is the rule suggested by the proposed official draft of May 3, 1962 of the American Law Institute's Restatement of the Foreign Relations Law of the United States, 74.
 
 
 17
 It is wholly immaterial that, during the long lapse of time after the Republic of Cuba filed its answer to the libel and its exception to the cross-libel, no substantial prejudice affirmatively appears to have been suffered by the libelant which would constitute the basis of an estoppel or a claim of laches. The general appearance was consent to be sued, and once the immunity is waived in a proceeding, it cannot be revived in that proceeding.
 
 
 18
 The only possible exception we would allow would arise out of a suggestion of immunity from the State Department. Though a foreign power may have waived its immunity in a pending action by the entry of a general appearance, the overriding political considerations would require recognition of the immunity when the State Department suggests its allowance is in the national interest notwithstanding the earlier general appearance.[13]
 
 
 19
 To constitute a waiver of immunity, of course, the appearance of the state must be general. When a foreign power enters a court of the United States as a claimant of a vessel, reserving its right to interpose objections and defenses including that of sovereign immunity, and when it thereafter asserts its sovereign immunity in the court and by diplomatic representations, with the result that the State Department files with the court a suggestion of immunity, there is no waiver.[14] Of course, there is no waiver when a foreign power appears specially to object to a taking of depositions until the State Department can act upon her representation in aid of a suggestion of immunity and when postponement was denied, appears specially for the purpose of asserting her immunity.[15]
 
 
 20
 Here, in strong contrast, Banco first, and then the Republic of Cuba, filed objections and then answers to the libels and cross-libels with no mention whatever of sovereign immunity until almost three years after the original libel had been filed. Then the controversy had long since been at issue on the merits, and the general appearance was an effective waiver of the immunity if immunity otherwise would have existed.
 
 
 21
 Cuba was under some economic pressure to come into the case if it wished to resist the claims of the libelants. It was under no compulsion, however, not to assert its claim of immunity, and it could have done so with a full reservation of its rights to defend on other grounds. When it chose not to assert its immunity, it waived the claim.
 
 
 22
 Under the circumstances, the fact that Cuba had an economic interest in entering the case does not militate against the finding of waiver. Porto Rico had the same economic interest in coming in to claim the disputed property, or suffer the risk of its loss in People of Porto Rico v. Ramos,[16] but was nevertheless found to have waived its immunity claim by its general appearance. The cases of The Sao Vicente[17] and the case of The Uxmal[18] are precisely comparable to this, while Ex Parte Republic of Peru[19] differs only in that Peru's appearance was not general and it adequately asserted its claim.
 
 
 23
 There remains a question of the extent and effect of the waiver.
 
 
 24
 A distinction has been drawn between jurisdictional immunity and immunity from execution of the property of a sovereign, and waiver of the former is not necessarily a waiver of the latter. Thus it has been held that Sweden's waiver of jurisdictional immunity which permitted an American court to adjudicate an adverse claim against her was not a consent to ancillary proceedings to attach her bank accounts and moneys due her from the Swedish American Lines.[20] Unrelated property of a foreign state may be immune from attachment as a basis for an exercise of a jurisdiction quasi-in-rem if the State Department suggests it.[21] The State Department now takes the position, however, that it will not suggest that the property of a foreign state is immune from attachment in aid of jurisdiction, but will continue to suggest that the same property is immune from execution.[22]
 
 
 25
 Recognition of the difference between the jurisdictional immunity of the Sovereign and that of his property from execution is unavailing to the Republic of Cuba here, for both were waived, the one affirmatively and the other inferentially.
 
 
 26
 Cuba came into the case as claimant of the ship. It sought affirmatively judicial determination of that claim and, by its answer, of the adverse claim of the libelant. Of course it could have appeared specially as claimant, asserting its claim of jurisdictional immunity, but when it did not, when it filed its answer, it lost forever the right to assert jurisdictional immunity.
 
 
 27
 Immunity of the ship from execution was also waived, for in this proceeding partly in rem against the ship and partly quasi-in-rem, the ship had already been arrested. If objection to execution immunity was to be made, it was timely when Banco and Cuba first appeared. It was no longer timely after their general appearance without reservation of any claim of immunity.
 
 
 28
 In such a case, a foreign state should be allowed to reserve its claim of execution immunity while waiving jurisdictional immunity and joining issue on the merits. It ought not to be under any obligation to reserve in any way its right to assert immunity of its unrelated, unarrested property from execution when it appears generally and waives its jurisdictional immunity. In short, no more should be read into a general appearance, without reservation, than it fairly implies. When seizure of the ship preceded the general appearance, however, when any objection to the exercise by the court of its power to seize the ship was then so patently appropriate, the absence of objection to the seizure, or reservation of a right to object, more than fairly implies waiver of immunity in both of its aspects.
 
 
 29
 It is quite immaterial to this question that, should the libelant ultimately prevail on the merits, the court's decrees can be enforced only through a sale of the ship. The immunity of the sovereign's property, if it exists, is from seizure; there is no immunity of such property from sale following a seizure which was, at the time or later became, unobjectionable and unassailable. The seizure, of course, was for the purpose of execution as well as of jurisdiction, and the right to assert immunity in both aspects was lost when the general appearance was entered without mention of it.
 
 
 30
 We conclude that the District Court properly denied the plea and motion of the Czechoslovakian Ambassador on behalf of the Republic of Cuba asserting the immunity claim. We do not consider, of course, the jurisdictional questions with which the District Court dealt in its earlier opinion.[23]
 
 
 31
 Affirmed.
 
 
 32
 ALBERT V. BRYAN, Circuit Judge (dissenting).
 
 
 33
 Despite the ability of the majority opinion, I think the plea and motion on behalf of the Republic of Cuba for the release of her ship, M/V Ciudad De La Habana, from arrest and attachment should have been granted on the basis of sovereign immunity. Without passing upon the availability or merits of Cuba's claim of immunity, the District Court disallowed it as waived through tardiness in presentation and this view is now approved.
 
 
 34
 I. I find no waiver by Cuba. After the filing of the amended libel in October 1959, and the hearing in December on exception and pleadings to the jurisdiction, nothing was done in the District Court until the February 1960 order upholding jurisdiction. The proceeding then remained inactive before the court until October 27, 1960, the day Cuba's claim was filed. According to the docket entries, no action was sought of the court before Cuba's immunity plea was lodged in May 1962. She had already filed a proper suggestion with the State Department. No one appears prejudiced by the delay, and so in admiralty Cuba would not be precluded by laches. 3 Benedict on Admiralty 295 (6th ed. 1940); Gardner v. Panama R.R., 342 U.S. 29, 30, 72 S.Ct. 12, 96 L.Ed. 31 (1951).
 
 
 35
 Cuba's appearance to claim the ship and to defend the first and intervening libels was not a waiver of immunity. Ex Parte Republic of Peru, 318 U.S. 578, 589, 63 S.Ct. 793, 800 (1943). Chief Justice Stone spoke to this point:
 
 
 36
 'Nor, in view of the purpose to be achieved by permitting the immunity to be asserted, are we able to perceive any ground for saying that the district court should disregard the claim of immunity, which a friendly sovereign is authorized to advance by way of defense in the pending suit, merely because the sovereign has seen fit to preserve its right to interpose other defenses. * * *'
 
 
 37
 Contrary to the intimation of the majority, it cannot be said that in this context Cuba is an 'unfriendly' power. Banco Nacional de Cuba v. Sabbatino, 376 U.S. 398, 410, 84 S.Ct. 923 (1964). Again, a claim by a foreign sovereign is not a general appearance. Ex Parte Muir, 254 U.S. 522, 532, 41 S.Ct. 185 (1921); Ervin v. Quintanilla, 99 F.2d 935, 939 (5 Cir. 1939), cert. denied, 306 U.S. 635, 59 S.Ct. 485, 83 L.Ed. 1037 (1939). It is but the exercise of a nation's right to remove her property. Nor does the added explanation of how ownership was acquired effect a waiver. Indeed, an explanation is procedurally correct. Ex Parte Muir, supra. Punctilious, also, is a prayer for dismissal of the libel. Ervin v. Quintanilla, supra.
 
 
 38
 Cuba's appearance was not voluntary. The Habana had been proceeded against in rem in twofold fashion: first, as a principal respondent to the libel and then as an ancillary party defendant under the foreign attachment issued on the in personam libel of Flota v. Banco. Cuba was not sued. These processes against the ship demanded an appearance by the owner at the risk of losing her. The A. J. Meerwald, 37 F.Supp. 808, 811 (D.N.J.1940). Had Cuba not made the claim, then despite her actual possession and undisputed ownership, a decree of sale would have forever and absolutely divested her ownership. The decree 'binds the world'. 2 Benedict on Admiralty 43 (6th ed. 1940). In Hilton v. Guyot, 159 U.S. 113, 167, 16 S.Ct. 139, 144, 40 L.Ed. 95 (1895) it is said:
 
 
 39
 'A judgment in rem, adjudicating the title to a ship or other movable property within the custody of the court, is treated as valid everywhere. As said by Chief Justice Marshall: 'The sentence of a competent court, proceeding in rem, is conclusive with respect to the thing itself, and operates as an absolute change of the property. By such sentence the right of the former owner is lost, and a complete title given to the person who claims under the decree. No court of co-ordinate jurisdiction can examine the sentence. The question, therefore, respecting its conformity to general or municipal law can never arise, for no co-ordinate tribunal is capable of making the inquiry.' * * * The most common illustrations of this are decrees of courts of admiralty and prize, which proceed upon principles of international law. * * *'
 
 
 40
 This feature-- an appearance in invitum-- distinguishes the instant case from People of Porto Rico v. Ramos, 232 U.S. 627, 34 S.Ct. 461 (1914) and Richardson v. Fajardo Sugar Co., 241 U.S. 45, 36 S.Ct. 476 (1916). In the former, the People of Porto Rico of her own volition and over the objection of the plaintiff entered the suit to oppose the plaintiff's action. In contrast, thereafter she endeavored to assert immunity from suit-- unsuccessfully of course. In Fajardo, Porto Rico was a sovereign sued in personam and so she could have ignored the suit in the Federal court without fear of a default judgment, for a judgment entered without her consent would be void. People of Porto Rico v. Rosaly Y Castillo, 227 U.S. 270, 33 S.Ct. 352, 57 L.Ed. 507 (1913). The Uxmal, 40 F.Supp. 258 (D.C.Mass.1941), cited by the majority to sustain waiver is unpersuasive because the court found the ship there was not owned by the foreign sovereign. Likewise unimpressive is The Sao Vicente, 281 F. 111 (2 Cir. 1922) and 295 Fed. 829 (3 Cir. 1924); where the claims were disposed of on the ground of faulty presentation. Importantly, Cuba was in uncontested possession and ownership of the Habana-- she was not the aggressor, but only a neutral between the contesting parties.
 
 
 41
 II. The doctrine of the United States, I believe, gives sovereign immunity in the circumstances. True, the State Department has not represented to this court its approval of Cuba's suggestion of immunity, so that determination of its allowance is a judicial question. Ex Parte Republic of Peru, supra, 318 U.S. 578, 587, 63 S.Ct. 793; Compania Espanola De Navagacion Maritima, S.A. v. the Navemar, 303 U.S. 68, 74-75, 58 S.Ct. 432 (1938); Rich v. Naviera Vacuba, S.A., 295 F.2d 24, 26 (4 Cir. 1961). But conclusive for me is the law as enunciated and expounded by the Supreme Court in Berizzi Bros. Co. v. S.S. Pesaro, 271 U.S. 562, 46 S.Ct. 611 (1926). So parallel are the facts there we quote the Court's narrative at p. 570, 46 S.Ct. at p. 611:
 
 
 42
 'In the libel the vessel was described as a general ship engaged in the common carriage of merchandise for hire. The Italian ambassador to the United States appeared and on behalf of the Italian government specially set forth that the vessel at the time of her arrest was owned and possessed by that government, was operated by it in its service and interest, and therefore was immune from process of the courts of the United States. At the hearing it was stipulated that the vessel when arrested, was owned, possessed, and controlled by the Italian government, was not connected with its naval or military forces, was employed in the carriage of merchandise for hire between Italian ports and ports in other countries, including the port of New York, and was so employed in the service and interest of the whole Italian nation, as distinguished from any individual member thereof, private or official, and that the Italian government never had consented that the vessel be seized or proceeded against by judicial process.'
 
 
 43
 The Court affirmed the allowance of the plea of immunity and on that ground entered a decree dismissing the libel.
 
 
 44
 Nevertheless, Flota vigorously argues and the majority opinion apparently implies that the immunity of a foreign flag would not extend to a commercial vessel, even though she sails in the name of or for the sovereign. The argument is that only warships or vessels clearly employed in an integral governmental function are secure. This contention was dealt with for the Court in the Berizzi case by Justice Van Devanter at 574, 46 S.Ct. at p. 612:
 
 
 45
 'We think the principles are applicable alike to all ships held and used by a government for a public purpose, and that when, for the purpose of advancing the trade of its people or providing revenue for its treasury, a government acquires, mans and operates ships in the carrying trade, they are public ships in the same sense that war ships are. We know of no international usage which regards the maintenance and advancement of the economic welfare of a people in time of peace as any less a public purpose than the maintenance and training of a naval force.'
 
 
 46
 Confessedly, the Habana was devoted to the 'purpose of advancing the trade' of Cuba. Severance of diplomatic contacts did not bar prosecution of her immunity claim. Banco Nacional de Cuba v. Sabbattino, supra, 376 U.S. 398, 410, 84 S.Ct. 923; Calderone v. Naviera Vacuba, S.A., 325 F.2d 76 (2 Cir. 1963). When the marshal arrested the Habana, she was not only in the ownership but also in the possession of Cuba. Also ante litem motam, Flota had been notified that all future instructions in respect to the ship would come from a Cuban government agency. Thus, there is not here the want of foreign custody which dissolved immunity in Mexico v. Hoffman, 324 U.S. 30, 65 S.Ct. 530, 89 L.Ed. 729 (1945).
 
 
 47
 I am not unaware of the able administrative commentaries to the effect that the rule of the Berizzi case is no longer the attitude of the United States Department of State. They maintain that under the 'restrictive' doctrine immunity will not be allowed a foreign country's vessel used in a private-type enterprise rather than for a conventional governmental purpose. Restatement, Foreign Relations Law, Explanatory Note 72, reporters' notes at 232 (Proposed Official Draft, May 3, 1962); Policy Research Study, The International Law of Sovereign Immunity by Joseph M. Swenney, p. 33 (Bureau of Intelligence and Research, U.S. Dept. of State) (Oct. 1963). But nowhere do I find the Supreme Court professing any change in its outlook, and I would await its own articulation, words for me preferable even to a scholar's forecast. Policy Research Study, supra, p. 21, 33.
 
 
 48
 At all events, the evidence does not warrant the application of the restrictive policy. The Habana had never entered into commerce. There is no avowal by Cuba of any such plan. Indeed, Cuba has not had any use whatsoever of the vessel since her acquisition. The Supreme Court of Canada emphasized the same want of proof in the suit, infra, before it:
 
 
 49
 'The material before us clearly indicates that at the time of their arrest the defendant ships, although lying idle in Halifax harbour and being equipped as trading or passenger ships, were nonetheless owned by and in possession of a foreign state and were being supervised by G.T.R. Campbell & Company which company was accounting for such supervision to 'a division of the Ministry of Revolutionary Armed Forces, Republic of Cuba.' Although the ships might ultimately be used by Cuba as trading or passenger ships, there is no evidence before us as to the use for which they were destined, and * * * I nevertheless do not feel that we are in a position to say that these ships are going to be used for ordinary trading purposes. All that can be said is that they are available to be used by the Republic of Cuba for any purpose which its government may select, and it seems to me that ships which are at the disposal of a foreign state and are being supervised for the account of a department of government of that state are to be regarded as 'public ships of a sovereign state' at least until such time as some decision is made by the sovereign state in question as to the use to which they are to be put.'
 
 
 50
 III. The immunity policy of the United States, as I see it, accords with Canada's. Cf. Ervin v. Quintanilla, supra, 99 F.2d 935, 940. For this reason, I think the judgment of the Supreme Court of Canada dismissing Flota's suit, upon the plea of sovereign immunity, is not to be rejected on the score of a diversity of policies. Likewise, the removal of the Habana from Nova Scotia to Baltimore to fit her for trade ventures does not destroy the factual analogy of the two cases. The seven ships at Halifax, it must be remembered, were undergoing conversion into 'trading or passenger ships'.
 
 
 51
 I do not think that Flota may relitigate the very issues it voluntarily put before the Canadian courts. There was no question of jurisdiction. The final decree binds Flota on the present issue of immunity because it was rendered in a controversy between Cuba and Flota, the suitor, in which Cuba had appeared personally.
 
 
 52
 After examining the point at length in Hilton v. Guyot, supra, 159 U.S. 113, 16 S.Ct. 139, 40 L.Ed. 95, the Court said in the companion case of Ritchie v. McMullen, 159 U.S. 235, 242, 16 S.Ct. 171, 174, 40 L.Ed. 133 (1895):
 
 
 53
 'By the law of England, prevailing in Canada, a judgment rendered by an American court under like circumstances would be allowed full and conclusive effect. * * *
 
 
 54
 'The defences set up in the answer to this action upon the Canadian judgment reduce themselves to an attempt, without any sufficient allegation of want of jurisdiction of the cause or of the defendant, or of any fraud in procuring that judgment, or of any other special ground for not allowing the judgment full effect, but upon general allegations setting up the same matters of defence which were pleaded and might have been tried in the foreign court, to reopen and try anew the whole merits of the original claim in an action upon the judgment. This, for the reasons stated in Hilton v. Guyot (ante, 159 U.S. 113, 16 S.Ct. 139,) supra, cannot be allowed.'
 
 
 55
 IV. Finally, even if the 'restrictive' policy should be applied, or if there was a waiver of immunity in regard to jurisdiction, still no sale of the Habana to satisfy a recovery by Flota of Banco could be decreed against her. See New York and Cuba Mail Steamship Co. v. Republic of Korea, 132 F.Supp. 684, 687 n. 7 (S.D.N.Y.1955). It is authentically recognized that even the restrictive theory does not sterilize the foreign state's immunity from the execution of a judgment. Secretary Rusk's News Conference, 45 State Dept. Bull. 277-78 (Aug. 14, 1961); Policy Research Study, supra, p. 48. Nor does waiver of jurisdiction-immunity constitute waiver of execution-immunity. Dexter & Carpenter, Inc. v. Kunglig Jarnvagsstyrelsen, 43 F.2d 705 (2 Cir. 1930).
 
 
 56
 With deference I question the majority's syllogism that the sovereign's immunity is only from initial seizure, that such seizure is for execution as well as jurisdiction and, ergo, having waived initial seizure, execution is thereby also waived. There is many a slip between seizure and execution. Waiver of the first is by no means a surrender to the latter-- any more than acknowledgment of process at law is consent to levy of a fieri facias. Execution, as used in connection with sovereign immunity, means the sale of the property. It is not effectuated by the arrest or the attachment. There is no equation of them with sale. Sale can be had only after decree implemented by a writ of venditioni exponas. 3 Benedict, supra, 252.
 
 
 57
 The Department of State, commentator and precedent, all observe the distinction between seizure and execution. Secretary Rusk's News Conference, supra, 45 State Dept. Bull. 277-78; Policy Research Study, supra, p. 48; Dexter & Carpenter, Inc. v. Kunglig Jarnvagsstyrelsen, supra, 43 F.2d 705. Certainly there is no proof here of waiver of the right to resist the sale. Indeed, auction of a foreign sovereign's unquestioned estate might, by infringing the province of international affairs reserved to the Executive in the United States, 'give offense' in foreign adjustments and 'to the prerogative right not to have sovereign property subject to suit.' Cf. Banco Nacional de Cuba v. Sabbattino, supra, 376 U.S. 398, 431, 438, 84 S.Ct. 923, 945.
 
 
 58
 Under the execution-immunity policy, as I understand it, the District Court is left to a bare adjudication of the issues presented-- determination of the liability of the ship, if there is a maritime claim against her-- without enforcement of any decree. Thereafter satisfaction of the adjudication is left to the channels of diplomacy. Hence, release of the Habana now, semble, could be readily stipulated. But if for jurisdictional considerations she should not now be released, the vessel ought not to be held after the termination of this suit unless in the meantime Cuba waived immunity.
 
 
 59
 V. As it has not been pursued further, I have assumed the correctness of the District Court's ruling that admiralty had jurisdiction because the agreement in suit was primarily a charter party, a matter admittedly within the admiralty, rather than a sale which is a transaction of questionable maritime legitimacy. But I am not certain that a breach of the Flota-Banco agreement would create a maritime lien upon the vessel. See Osaka Shosen Kaisha v. Pacific Export Lumber Co., 260 U.S. 490, 43 S.Ct. 172, 67 L.Ed. 364 (1923). If it does not, then the query arises as to how Flota's in rem libel of the Habana could be pressed against the vessel, regardless of any waiver of immunity. The foreign attachment would fall because Banco was not the owner of the ship. I mention these issues simply to disavow any understanding on my part that the Court is by its remand impliedly upholding admiralty jurisdiction of Flota's claim against the vessel. I have no doubt that on the only question before us-- Cuba's right to possession of the Habana by virtue of sovereign immunity-- there is maritime jurisdiction. Compania Espanola v. Navemar, supra, 303 U.S. 68, 75, 58 S.Ct. 432; Rich v. Naviera Vacuba, S.A., supra, 295 F.2d 24, 26 (4 Cir. 1961). Of other admiralty jurisdiction I am not so clear.
 
 
 60
 In my judgment the decree denying Cuba sovereign immunity should be vacated, and the cause remanded to the District Court with directions to release the vessel to the diplomat representing Cuba.
 
 
 
 [1]
 Flota Maritima Browning De Cuba, Sociadad Anonima v. The Ciudad De La Habana, D.C.D.Md., 181 F.Supp. 301
 
 
 [2]
 Diplomatic relations with Cuba were severed on January 3, 1961
 
 
 [3]
 1960 A.M.C. 496
 
 
 [4]
 1962 S.C.R. 596
 
 
 [5]
 The Schooner Exchange, 7 Cranch (11 U.S.) 116, 3 L.Ed. 287
 
 
 [6]
 Berizzi Brothers Company v. Steamship Pesaro, 271 U.S. 562, 46 S.Ct. 611, 70 L.Ed. 1088. See Ex Parte Republic of Peru, 318 U.S. 578, 63 S.Ct. 793, 87 L.Ed. 1014. There are indications that the doctrine has been extended too far and that the Supreme Court may find occasion to constrict its extended boundaries. See footnote 10, infra
 
 
 [7]
 Ex Parte Republic of Peru, 318 U.S. 578, 63 S.Ct. 793
 
 
 [8]
 Rich v. Naviera Vacuba, S.A., 4 Cir., 295 F.2d 24
 
 
 [9]
 Compania Espanola De Navagacion Maritima, S.A. v. The Navemar, 303 U.S. 68, 58 S.Ct. 432, 82 L.Ed. 667. See Rich v. Naviera Vacuba, S.A., 4 Cir., 295 F.2d 24
 
 
 [10]
 We do not know, of course, the reason for the Secretary's inaction here
 It may be that he thinks, the doctrine inapplicable to the property of an unfriendly power, with which the United States does not now maintain diplomatic relations. There is authority for that proposition, The Gul Djemal, S.D.N.Y., 296 F. 563; The Gul Djemal, S.D.N.Y., 296 F. 567, and need to avoid possible affront to an unfriendly power does not necessarily follow from recognition of need to avoid possible affront to friendly powers. The Supreme Court recently held in Banco Nacional de Cuba v. Sabbatino, Receiver, 376 U.S. 398, 84 S.Ct. 923, 11 L.Ed.2d 804, that the act of state doctrine foreclosed consideration in the courts of this country of the validity under international law of a Cuban expropriation decree. There the Attorney General, joined by an attorney of the Department of State, filed an amicus brief supporting the view the Court took. Applicability of the act of state doctrine under those circumstances does not necessarily suggest applicability of the doctrine of sovereign immunity to Cuban property arrested in this country when the Department of State has manifested no interest in it.
 In 1961 the State Department did suggest the sovereign immunity of a Cuban ship and her cargo, a suggestion which we accepted unquestioningly. Rich v. Naviera Vacuba, S.A., 4 Cir., 295 F.2d 24. Intervening history may have altered its view.
 The State Department's inaction may arise out of its restricted theory of sovereign immunity, a theory which denies its recognition in direct proceedings arising out of commercial transactions conducted by a foreign state, however friendly, outside her borders.
 When nations throughout the world began to participate directly in international commerce, reconsideration of the absolute theory of sovereign immunity became appropriate. Appropriateness became compelling when some countries became state traders, engaging, exclusively, or nearly so, of her private citizens, in the international carriage of goods and trade, which, in other countries, is left largely to private citizens or companies. The development created disparity in the operation of the classical theory of absolute sovereign immunity and extended it in operation to limits not envisioned when that theory was in full flower.
 In consequence, a growing number of nations have adopted a more restricted theory which denies immunity in controversies arising out of commercial transactions, and it is clear that international law does not require absolute immunity in such cases.
 Our own State Department has adopted the restricted view. This is evidenced by the letter of May 19, 1952 of Jack B. Tate, the Acting Legal Advisor of the State Department, to the Acting Attorney General (See 26 Dept. of State Bull. 984) outlining the view of the Department. The United States does not now claim immunity in the courts of any foreign state when the proceedings arise out of commercial transactions of the United States. Generally, the State Department will no longer suggest immunity of a foreign state in similar circumstances.
 The restricted view of sovereign immunity has not been, but in time probably will be, adopted by the courts of the United States. That is to say it has not yet been sanctioned by the Supreme Court of the United States or endorsed by inferior federal courts, but it has been embraced by a Florida District Court of Appeal. Harris & Company Advertising, Inc. v. Republic of Cuba, 127 So.2d 687.
 Long before the need to reconsider the doctrine of absolute immunity arose, the Supreme Court of the United States held that sovereign immunity extended to a merchant vessel of a foreign power. Berizzi Brothers Company v. Steamship Pesaro, 271 U.S. 562, 46 S.Ct. 611. The basis of that decision was that the open invitation of our ports was not restricted to the naval vessels of foreign powers, but included merchant vessels which a foreign power might operate in furtherance of its determination of its public interest. The Tate letter, however, destroyed the immunity implication of the invitation which controlled the decision in The Pesaro. If now foreign nations are forewarned that the State Department will not support claims of sovereign immunity in this context and the United States claims no such immunity abroad, the rationale of the decision in The Pesaro is interred. If there is no restraint of international law, and there is none, and if there is no want of forewarning, and there is none, then the rule of The Pesaro has lost its base. Indeed, when the same question was again before the court, decision was put solely upon the basis of the State Department's suggestion of immunity, Ex Parte Republic of Peru, 318 U.S. 578, 63 S.Ct. 793, a suggestion with the Department now declines.
 Obviously, the rule of The Pesaro has been undermined by later Executive determinations which reversed the assumptions which controlled the decision in The Pesaro. Thus the American Law Institute in its proposed draft of May 3, 1962 of the Restatement of the Foreign Relations Law of the United States proposes the commercial exception and supports its proposal splendidly. See the Reporter's Notes to 72.
 
 
 [11]
 The Sao Vicente, 2 Cir., 281 F. 111; The Sao Vicente, 3 Cir., 295 F. 829; The Uxmal, D.C.Mass., 40 F.Supp. 258; and see Ex Parte Republic of Peru, 318 U.S. 578, 63 S.Ct. 793
 
 
 [12]
 Richardson, as Treasurer of Porto Rico, v. Fajardo Sugar Company, 241 U.S. 44, 36 S.Ct. 476; The Sao Vicente, 2 Cir., 281 F. 111; The Sao Vicente, 3 Cir., 295 F. 829; The Uxmal, D.C.Mass., 40 F.Supp. 258
 
 
 [13]
 Rich v. Naviera Vacuba, S.A., 4 Cir., 295 F.2d 24; and see Ex Parte Muir, 254 U.S. 522, 41 S.Ct. 185, 65 L.Ed. 383
 
 
 [14]
 Ex Parte Republic of Peru, 318 U.S. 578, 63 S.Ct. 793
 
 
 [15]
 Ervin v. Quintinalla, 5 Cir., 99 F.2d 935
 
 
 [16]
 232 U.S. 627, 34 S.Ct. 461
 
 
 [17]
 2 Cir., 281 F. 111; 3 Cir., 295 F. 829
 
 
 [18]
 D.C.Mass., 40 F.Supp. 258
 
 
 [19]
 318 U.S. 578, 63 S.Ct. 793
 
 
 [20]
 Dexter & Carpenter v. Kunglig Jarnvagsstyrelsen, 2 Cir., 43 F.2d 705. To the same effect see Weilamann v. Chase Manhattan Bank, 21 Misc.2d 1086, 192 N.Y.S.2d 469
 
 
 [21]
 New York & Cuba Mail Steamship Company v. Republic of Korea, S.D.N.Y., 132 F.Supp. 684
 
 
 [22]
 Stephen v. Zivnostenska Banka, National Corporation, 15 A.D.2d 111, 222 N.Y.S.2d 128, 45 Dept. State Bull. 275, 278. Exemption from execution or attachment of property of a foreign state held in this country for its commercial purposes has been criticized. See 54 Mich.L.Rev. 1008, 1010, criticizing the result of New York & Cuba Mail Steamship Company v. Republic of Korea, supra, fn. 21, and 75 Harv.L.Rev. 1607, 1612-1613, approving the result of Harris & Company Advertising Inc. v. Republic of Cuba, 127 So.2d 687 (Fla.Dist.Ct.App.1961) holding that commercial assets were not immune from execution. We need not now enter that controversy
 
 
 [23]
 Flota Maritima Browning De Cuba, Sociadad Anonima v. The Ciudad De La Habana, D.C.D.Md., 181 F.Supp. 301